[This decision has been published in *Ohio Official Reports* at 97 Ohio St.3d 335.]

THE STATE OF OHIO, APPELLEE, *v*. MYERS, APPELLANT.

[Cite as *State v. Myers,* 2002-Ohio-6658.]

*Criminal law—Aggravated murder—Death penalty upheld, when—Speedy-trial rights not violated, when.*

(No. 1999-0395—Submitted June 26, 2002—Decided December 13, 2002.)

APPEAL from the Court of Appeals for Greene County, No. 96CA38.

_____

PFEIFER, J.

{¶1} During the early morning hours of August 4, 1988, Amanda Maher was found barely alive near the railroad tracks on the south side of Xenia. Maher died shortly thereafter while being flown to the hospital. Defendant-appellant, David L. Myers, who had been seen walking with Maher in the direction of the railroad tracks shortly before her body was discovered there, was indicted for the murder of Maher. The case was declared nolle prosequi in February 1991. Two years later, Myers was reindicted for the murder of Maher and was subsequently found guilty of aggravated murder and sentenced to death.

{¶2} On August 3, 1988, Amanda Maher, and her boyfriend, Glenn Smith, went to the Five Points Tavern, a.k.a. Leahy's, in Xenia following an afternoon of house-hunting for themselves and their daughter, Sarah. The couple had a few drinks and left Five Points at around 7:30 p.m. to attend the Greene County Fair. They arrived back at Five Points around 9:30 to 10:00 p.m., and Smith resumed drinking while shooting pool with Lee Weimer, the bartender on duty.

{¶3} Between 10:30 and 11:00 p.m. that night, David Myers arrived at Five Points and played pool and drank with Smith. Smith recognized Myers as an occasional customer of the tavern from Smith's work there as a weekend bartender. During this time, Myers remarked to Smith about the Mickey Mouse shirt Maher

was wearing, to the effect that he wanted to play with Mickey's ears or nose because he liked where they were positioned on the shirt. Smith admonished Myers that he did not appreciate the remark. Smith left the bar for about fifteen minutes to get fresh air, then came back and resumed drinking and shooting pool with Myers.

{¶4} Sometime after midnight, Smith and Maher left to go to the nearby Round Table bar. Myers asked to come along, and the three drove over to the Round Table in Smith's car. After arriving at the bar, Maher went inside, but Smith "had a few more words" with Myers before they went in. Smith was upset with Myers about sexual remarks he was making about Maher. After Myers and Smith went inside, Smith got "kind of rowdy" while drinking whiskey slammers with Myers. Teresa Mellotte, the bartender on duty that night at the Round Table, warned Smith to quit or she would ask him to leave. Smith threw his glass to the floor, and when he refused to leave, Mellotte phoned the police.

{¶5} Smith became belligerent with two Xenia police officers, Patrolmen Daniel Savage and Richard E. Rinehart, who arrived on the scene at approximately 1:15 a.m. The officers escorted Smith outside, where Savage handcuffed him and placed him under arrest. He then explained to Maher what was going to happen with Smith. Maher asked whether she could have Smith's wallet, and Smith allowed Savage to retrieve it from his back pocket to give to Maher. Smith also allowed Savage to retrieve what Smith thought were his car keys. Maher discovered shortly thereafter that none of the keys she received fit Smith's car. At that point, Myers approached Savage and told him, "I will make sure she gets home. I will take care of her." Myers also told Smith in the back of the patrol car, "I will take care of her, Glenn."

{¶6} Savage took Smith to the county jail while Rinehart followed in his patrol car. Rinehart left the jail at 1:23 a.m. and resumed his patrol duties. Meanwhile, Maher and Myers reentered the Round Table looking for Smith's car keys. Maher borrowed a flashlight from Mellotte in order to look for the keys in

the parking lot. Charles Van Hoose, a bar patron at the Round Table, noticed that Myers had his arm around Maher, reassuring her that he would take care of everything. When Van Hoose looked out the tavern door while buying another beer, he saw Myers and Maher walk across the tavern parking lot toward Home Avenue.

{¶7} Also at this time, Officer Rinehart was in his police car on patrol and saw Myers and Maher walking northwest on the sidewalk along Home Avenue toward South Detroit Street. He testified that he saw Maher approximately three hundred yards from the spot where she was eventually discovered, barely alive.

{¶8} At 2:10 a.m., Lee Weimer looked out the door of the Five Points Tavern and saw Myers, alone, getting into his car and driving away. Around 2:15 a.m., Myers entered the Round Table, ordered a drink from Mellotte, and went straight to the restroom for several minutes. Don Hilderbrand was one of the few patrons left in the bar. Earlier, he had seen Smith break the glass and get arrested. He also had seen Myers and Maher leave the bar together approximately twenty minutes after Smith's arrest. When Myers came out of the restroom, Hilderbrand asked Myers "if he got any [sex]" from Maher. Myers responded that "he tried, but she wasn't willing and he just dropped her off."

{¶9} At approximately 3:00 a.m., Jennifer Berry was walking home with a friend when she came upon "a girl laying [sic] on the tracks" gasping for air. Berry and the friend ran to her house, talked the situation over, and called the police. Officer John Waldren was first on the scene after receiving a dispatch for "a female down in the area" of Railroad Street. The officer called out to her but could only hear moans and groans. The woman, later identified as Maher, had a shirt pulled up around her neck with no other clothing on. Officer Savage, who was in the area nearby investigating a burglary, also heard the police dispatch and ran down to the railroad tracks. Savage did not recognize Maher from his earlier encounter with her at the Round Table bar. He noticed what he thought was a cinder on the right

side of Maher's face. He suddenly realized that a railroad spike had been driven into her head. He also noticed that little blood was coming out of that wound.

{¶10} Maher was rushed to Greene Memorial Hospital but died shortly after 6:00 a.m. while being life-flighted to Miami Valley Hospital. Robert D. Setzer, an agent of the BCI Crime Scene Search Unit, went to the Greene Memorial Hospital, where Maher's body had been returned, and performed tape lifts on Maher's hands and pubic area for evidence.

{¶11} Dr. Justin G. Krause, the Greene County Coroner, observed most of the autopsy performed by a Dr. Mannarino. Dr. Krause testified that Maher had sustained two fractures to her jaw as the result of a blunt force injury and noted that some knitted material wrapped tightly around her throat caused an abrasion on her neck. He further opined that Maher's forehead wounds were caused by an attempt to drive a railroad spike into her forehead. The spike driven into Maher's right temple acted as a plug that permitted only minimal bleeding. Fingernail mark patterns on Maher's neck indicated that the perpetrator had sustained an injury to his right ring finger. Myers suffered such an injury in a motorcycle accident one month prior to the murder.

{¶12} During the autopsy, three stones were removed from Maher's vaginal canal through her abdominal cavity. The three stones were approximately the same size and measured roughly seven centimeters by four centimeters, and 1/2 centimeter around. Dr. Krause opined that it was likely that the stones were inserted in Maher's vaginal canal after she was unconscious. Maher died of severe head trauma, produced by a penetrating railroad spike through her right temple and attempted strangulation.

{¶13} Xenia police apprehended Myers later on the afternoon of August 4, but he denied killing Maher. Myers claimed that he had last seen Maher on her hands and knees looking for car keys in the Round Table parking lot. A search of Myers's Ford Mustang pursuant to a warrant resulted in the discovery of wallets

belonging to Maher and Smith, stuffed inside a glove under the front passenger seat. While Myers was being booked at the county jail, he remarked to Deputy Sheriff Thomas A. Adkins, "Tom, man, cocaine will make you do anything. It will make you do anything to get it."

{¶14} On August 8, 1988, the grand jury indicted Myers on one count of aggravated murder. A death penalty specification alleged that Myers had committed the aggravated murder during a robbery. On February 1, 1991, the prosecuting attorney entered a nolle prosequi on the murder indictment against Myers. Around one month later, Myers was arraigned on eleven counts of forgery. On April 22, 1991, he pled guilty to the forgery charges and was sentenced to three years in prison.

{¶15} After the nolle prosequi, Greene County authorities continued investigating the Maher murder case. On February 12, 1993, Myers was arraigned upon reindictment in the Maher murder on a charge identical to that declared nolle prosequi in February 1991. Over the next few years, Myers's case was continued repeatedly at his request. The trial court overruled several defense motions to dismiss the case on speedy trial grounds.

{¶16} Finally, on January 9, 1996, a jury trial began, which lasted nearly a month. At trial, Mark Timmons, a fellow inmate of Myers in 1989, testified that he had overheard Myers discussing his case with another inmate at the county jail. In two conversations, Myers had talked of being with Maher around the railroad tracks.

{¶17} David Tincher was incarcerated in the same county jail cellblock as Myers during August 1988. Myers said to Tincher out of the blue, "They couldn't get me on a rape." Myers also asked Tincher whether he had ever "put three rocks in a girl." Tincher responded that he had not, and Myers stated that he had. Tincher knew nothing of Maher's murder, except that it involved a railroad spike. A few days later, Tincher asked Myers, "Why a railroad spike?" Myers replied, "Because

it was handy." After that, Myers told Tincher, "Don't ever try to drive nothing through nobody's forehead. * * * He said it won't go, but he said it went through the temple."

{¶18} Also during trial, three expert witnesses testified on behalf of the state regarding the foreign hair found on Maher. BCI forensic scientist Michelle Yezzo opined that she was 100 percent certain that the hair was a human pubic hair from a Caucasian. Yezzo found similarities and differences in her comparison of pubic hair samples provided by Myers. However, she could neither confirm nor eliminate Myers as the donor of the pubic hair and suggested that the prosecutor's office submit the pubic hair to another lab for further analysis.

{¶19} Forensic scientist Larry M. Dehus analyzed the foreign pubic hair and found that the microscopic characteristics "were identical to the microscopic characteristics found in the known hair sample" from Myers. Forensic scientist Richard Bisbing also analyzed the foreign pubic hair and found it "indistinguishable microscopically" from the pubic hair sample provided by Myers.

{¶20} Dr. Edward Blake, a forensic serologist, subjected the foreign pubic hair to DNA analysis. Using the PCR (polymerase chain reaction) method, Dr. Blake concluded that the foreign pubic hair bore the same "DQ Alpha genotype" as the known sample from Myers. He further testified that such a genotype is found in approximately two percent of the Caucasian population of North America.

{¶21} During the state's case in chief, Myers's civil deposition was read into the record. This deposition had been taken in 1992 by attorneys for the Greene County Prosecuting Attorney in connection with a federal lawsuit filed by Myers after the murder charges against him were dismissed in February 1991.

{¶22} Deborah Reagin was the final witness to testify for the state. Reagin asserted that Myers had offered her a ride home after she had had a fight with her boyfriend in a Xenia bar in February 1986. Reagin testified that Myers had raped her in a cemetery before dropping her off at her dorm in Yellow Springs. Myers

later entered an *Alford* plea to sexual battery, was found guilty, and was sentenced to six months in jail and five years' probation.

{¶23} The defense called 19 witnesses, and the state countered with 4 rebuttal witnesses. After deliberation, the jury found Myers guilty as charged.

{¶24} At the mitigation hearing, Myers took the stand and subjected himself to cross-examination. Myers claimed that he had not killed Maher and asserted that the witnesses testifying against him were lying about his involvement. Myers's mother, ex-wife, and current wife, among others, testified on his behalf.

{¶25} The jury recommended death, and the court imposed a sentence of death. At the sentencing hearing, the court noted that it had received a victim impact statement from Maher's family but asserted that that statement did not affect its decision.

{¶26} Upon appeal, the court of appeals affirmed the convictions and death sentence. The cause is now before the court upon an appeal as of right.

{¶27} Appellant has raised 32 propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's conviction for aggravated murder or his death sentence. We have also independently weighed the aggravating circumstance against the evidence presented in mitigation and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's convictions and death sentence.

*Due Process: Pre-Indictment Delay*

{¶28} In Proposition of Law 2, Myers contends that the prosecution unduly delayed filing the second murder indictment against him in order to gain a tactical advantage. Myers asserts that the nolle prosequi allowed the state to gain a tactical advantage by delaying his trial for over four years. Myers contends that this delay allowed the state to discourage the testimony of a key defense witness, Kim Grimes, and to hire additional experts to bolster Michelle Yezzo's hair analysis. Myers argues that the delay prejudiced his right to due process under *United States v. Marion* (1971), 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468, and *State v. Luck* (1984), 15 Ohio St.3d 150, 15 OBR 296, 472 N.E.2d 1097, paragraph two of the syllabus.

{¶29} Myers's arguments are not well taken. Defense counsel was convinced of Myers's innocence and implored the prosecutor to investigate Gregory Grimes and Terrance Rogers as suspects in the Maher murder. Prosecutor William Schenck considered defense counsel's entreaties and decided to nolle prosequi the murder case in February 1991, and to undertake further investigation.

{¶30} Myers fails to demonstrate prejudice in being unable to locate Kim Grimes, the ex-wife of Gregory Grimes. While the first indictment was pending, Kim Grimes told authorities that her ex-husband claimed to have been present at Maher's murder and had implicated himself and another person in her death. Gregory Grimes was called as a defense witness, and admitted that he "might have" told his ex-wife that he killed Maher. Grimes asserted that he did so out of anger at his ex-wife.

{¶31} It does not appear to us that the state delayed the case for more analysis of the foreign pubic hair found on Maher because Yezzo's determination was "unfavorable." Yezzo testified that the pubic hair exhibited "similarities and differences" when compared to samples provided by Myers, but Yezzo could not conclusively designate him as the donor. Such a finding by Yezzo was not

8

necessarily "unfavorable," as Myers contends. Yezzo did not exclude Myers as the donor of the hair, but did exclude all other known suspects to the murder, including Grimes and Rogers. Moreover, the additional experts hired to analyze the pubic hair did not cause any preindictment delay, since all such testing had been completed well before the case was nolled in 1991.

{¶32} Contrary to Myers's arguments, we find that the delay in this case resulted from defense requests and from the court's efforts to ensure that the right suspect was brought to justice. Since Myers fails to demonstrate that the state improperly delayed his trial, we overrule Proposition of Law 2.

*Speedy-Trial Issues*

{¶33} In seven separate propositions of law (6 through 12), Myers contends that his right to a speedy trial pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, Section 10, Article I of the Ohio Constitution, and R.C. 2945.71 was infringed.

{¶34} Under R.C. 2945.71(C)(2), the state is required to bring a defendant to trial on felony charges within 270 days following arrest. Each day the defendant is held in jail in lieu of bail on the pending charge is counted as three days. R.C. 2945.71(E). The time computation may be tolled by provisions in R.C. 2945.72, including delays necessitated by motions raised by the accused, and the period of any continuance requested by the accused, or any reasonable continuance granted other than upon the request of the accused. R.C. 2945.72(E), (H).

{¶35} In Proposition of Law 6, Myers argues that the nolle prosequi entered in 1991 was undertaken ex parte and was therefore invalid. However, in our view, the nolle prosequi was entered by the state in part based on defense arguments that there was insufficient proof and that further investigation of other suspects was necessary.

{¶36} The period between a dismissal of charges without prejudice and the filing of a subsequent indictment premised upon the same facts is not counted for

purposes of computing the speedy-trial time period set forth in R.C. 2945.71 et seq. *State v. Broughton* (1991), 62 Ohio St.3d 253, 581 N.E.2d 541, paragraph one of the syllabus. Although Myers was in jail during most of the time between the nolle prosequi and his reindictment on February 4, 1993, his imprisonment resulted from his conviction on 11 counts of forgery in a wholly unrelated matter. Hence, Proposition of Law 6 is not well taken.

{¶37} In Proposition of Law 7, Myers contends that he was not brought to trial within 270 days of his arrest as required by R.C. 2945.71(C)(2).

{¶38} In computing the time in this case in conformity with the speedy-trial statute, Myers is not entitled to the triple-count provision of R.C. 2945.71(E) for the time he was held in jail, since a probation detainer was placed against him the day after his August 4, 1988 arrest. *State v. Martin* (1978), 56 Ohio St.2d 207, 10 O.O.3d 369, 383 N.E.2d 585; *State v. Phillips* (1990), 69 Ohio App.3d 379, 381, 590 N.E.2d 1281.

{¶39} The original trial date was set for November 7, 1988, then moved up by the trial court to October 31, 1988. Under R.C. 2945.71(C), time ran against the state from Myers's arrest on August 4 until October 14, 1988, when Myers moved for a continuance, and the trial was moved to January 23, 1989. This amounts to a 71-day delay. Although Myers was incarcerated from the time of his arrest, the triple-count provisions of R.C. 2945.71(E) do not apply, because on August 5, 1988, the day after Myers's arrest, a probation detainer was placed on him and he was held pursuant to that detainer rather than on the "pending charge" of the Maher murder. In order to be entitled to the triple-count provision, a defendant must be held on the "pending charge." Id.

{¶40} Myers next moved for a continuance on December 15, 1988, which the trial court granted, delaying the trial until April 3, 1989. Upon Myers's motion, the trial was again continued until May 8, 1989. At this juncture, the number of

days chargeable to the state remains at 71. See R.C. 2945.72(H) (continuances granted at defendant's request are not chargeable to the state).

{¶41} On March 24, 1989, the state moved for a continuance, which was granted until June 12, 1989. On June 7, the state moved for another continuance, getting an extension until September 5, 1989. It is these two state-requested delays that Myers challenges as unreasonable and therefore chargeable to the state under R.C. 2945.72(H) (only "reasonable" delays sought by state are not chargeable to state).

{¶42} The first continuance was requested so that the state could conduct further forensic testing on a foreign pubic hair found on Maher's body. Testing had already shown that similarities existed between this hair and the sample provided by Myers. But the state had been advised that a new form of DNA testing would enhance the identifiability of the hair. The state wished to have these further tests performed by the "most qualified" expert in the country, who worked out of California. This expert had an immovable 12-week backlog of cases, necessitating the state's request for a continuance. It would be difficult to characterize this request as unreasonable. The foreign hair was a crucial item of evidence, and the new, more sophisticated DNA test might prove vital to the state's case. It was even conceivable that the test might have excluded Myers as the source of the foreign hair. Thus, the request for the continuance was not unreasonable and cannot be charged against the state.

{¶43} The second continuance challenged by Myers was requested by the state on June 7, 1989. The state set forth two reasons for its request. First, through no fault of the state, the California DNA testing had been delayed and the results would not be available until mid-July 1989. Second, the state claimed not to have received any discovery from the defense, which had been ordered by the court with a deadline of May 23. With only five days remaining until the scheduled trial date, the state argued that it could not properly prepare for trial without the discovery

materials.  The defense objected to the delay but did not deny that it had failed to provide the necessary discovery.  Moreover, the defense conceded at the motion hearing that it might want to conduct its own tests on the hair depending on what the California results were.  Since those results were expected in mid-July, it was reasonable for the court to provide extra time should these additional defense tests be desired.

{¶44} Moreover, during this period between May 8, 1989 and September 5, 1989, Myers had many motions pending, including motions to suppress eyewitness identification, a motion to quash search warrant, and a motion to suppress all evidence.  Thus, the defendant himself contributed to the delay.  See R.C. 2945.72(E).

{¶45} Thus, the continuances challenged by Myers were reasonable.  The trial was properly continued until September 5, 1989, and the delay shall not be charged against the state.  The total days charged to the state as of September 5, 1989, is still 71.

{¶46} On August 29, 1989, Myers moved for another continuance, which was granted until November 27, 1989.  This delay must be charged to the defense. The defense moved for a further continuance on November 2, 1989, as a result of which the trial was delayed until April 16, 1990.  In its entry granting the continuance, the court stated that "Defendant has waived his right to a speedy trial and the time does not count against the State."  The defendant himself, with counsel present, agreed to this delay in open court.

{¶47} In an entry dated March 9, 1990, the trial court noted that Myers had notified the court that he desired new counsel and that two attorneys had stated to the court that they might be able to represent Myers.  Myers retained them on March 23, 1990, a mere three weeks before trial.

{¶48} On April 17, the day after trial was to begin, the court entered an order continuing the trial until October 9, 1990.  It is unclear from the record who

requested this delay, but Myers concedes in his brief to this court that it is chargeable to the defense as it is "clear" that it was necessitated by his retention of new counsel.

{¶49} For reasons not clear from the record, trial did not begin on October 9, 1990, as scheduled. Instead, at a hearing on October 17, 1990, the court stated that the trial would be continued until March 3, 1991. At that hearing, defense counsel concurred with the delay, stating that "that's a date that is easily acceptable." So the most that could be charged against the state would be the unexplained delay between October 9 and 17, adding 8 days to the total of 71 for a new total of 79.

{¶50} On February 1, 1991, the case was nolled, and as explained in our discussion of Proposition of Law 6, the time between dismissal and reindictment two years later is not chargeable against the state.

{¶51} On April 12, 1991, Myers's probation detainer was terminated and he was released. On April 22, 1991, Myers pled guilty to 11 unrelated forgery charges and was sentenced to three years in prison. He was reindicted on the Maher aggravated murder charge on February 4, 1993, and the warrant for his arrest was returned the next day. Myers was in the Dayton Correctional Center at the time of his rearrest, serving his sentence on the forgery charges. For this reason, Myers is not entitled to the triple-count provisions of R.C. 2945.71(E) (triple count applies only to days accused is held on "pending" charge). Myers was ordered released on bond on February 22, 1993.

{¶52} Trial on the Maher charge was set for March 1, 1993. The period between February 5 and February 25, 1993, is chargeable to the state, adding another 20 days to the total, which now stands at 99 days.

{¶53} On February 26, 1993, Myers moved for a continuance, which was granted until October 12, 1993. Myers moved to vacate that trial date on September 13, 1993, and trial was moved to January 24, 1994. On January 3, 1994, a hearing

was held in which the defense agreed to a further continuance until July 11, 1994. At a hearing on June 22, 1994, Myers personally informed the court that he desired to change counsel again and that the July 11 trial would have to be further delayed. Myers's new counsel agreed to a new trial date of October 11, 1994.

{¶54} On September 12, 1994, Myers moved for a further continuance. The trial court moved the trial date to February 27, 1995. Myers asserts that this continuance should not be charged against him, because the entry granting it does not specifically state that he requested it. Myers cites *State v. Geraldo* (1983), 13 Ohio App.3d 27, 13 OBR 29, 468 N.E.2d 328. However, contrary to the statement in *Geraldo*, this court has never required that the entry identify the defendant as the requesting party. Thus, the fact that the entry did not list Myers as the requesting party is irrelevant since the record shows that it was Myers who specifically requested this delay.

{¶55} On January 26, 1995, Myers requested yet another delay, which was denied. On February 24, 1995, on the eve of trial, Myers filed a waiver of his speedy trial rights until September 11, 1995, and the trial was continued until that date.

{¶56} On August 11, 1995, Myers moved for another continuance, which was granted until either October 16, 23, or 30, 1995, depending on defense counsel's availability due to another trial. Based on counsel's unavailability, Myers requested another continuance on September 25, 1995, which was granted until either November 13, 20, or 27, or December 4, 1995.

{¶57} On November 11, 1995, Myers filed an affidavit of disqualification against the trial court judge, which automatically divests the judge of jurisdiction to proceed until the matter is resolved by this court. R.C. 2701.03(D)(1). Thus, the trial proceedings were suspended, and any delay is not chargeable to the state. This court announced its denial of the affidavit of disqualification on November 30, 1995, at which point the running of the speedy-trial period resumed.

**{¶58}** In accordance with an order of the trial court on August 18, 1995, defense counsel had been submitting regular "status reports" informing the court of the progress of other trials that defense counsel was litigating. Myers had agreed at a hearing on that date to delay his own trial until these other proceedings were concluded. Upon the receipt of each report, the trial court would set a new hearing date, based upon defense counsel's estimate of when these other trials would end. On November 17, 1995, based on a status report filed that day, the court rescheduled the trial for either December 11 or 18, 1995. For reasons that are not clear from the record, the trial date was once again extended by entry of the court to January 2, 1996. This is the date on which trial finally commenced. Because it is not clear who requested this continuance or the reason behind it, the 15-day delay from December 18, 1995 to January 2, 1996, must be charged to the state. Thus, the number chargeable to the state rises to 114 days, well within the limit imposed by R.C. 2945.71(C)(2).

**{¶59}** Myers's argument that his statutory speedy-trial right was violated is rejected.

**{¶60}** In Proposition of Law 8, Myers asserts that an accused does not waive his statutory speedy-trial rights by not filing a motion for discharge. Myers complains that the court of appeals erroneously held that he waived any objection to any continuances granted after October 6, 1995, since he failed to file any additional motions for discharge on speedy-trial grounds after that date.

**{¶61}** We disagree. As explained above, Myers was brought to trial within the strictures of the speedy-trial statutes, R.C. 2945.71 et seq. The issue is therefore moot. However, even if delays after October 6, 1995, were chargeable to the state, Myers was still brought to trial within the 270-day statutory timeframe, as the period between October 7, 1995 and January 2, 1996, is only 87 days, bringing the total to 186 (excluding the 15-day delay in that period that was already charged to the state).

{¶62} In Proposition of Law 9, Myers argues that several of the journal entries granting delay in this case were insufficient because they did not specify the party requesting the continuance. In support, Myers relies on *State v. Geraldo*, 13 Ohio App.3d 27, 13 OBR 29, 468 N.E.2d 328. However, as explained above, this court has never required such identification in the journal entry. Moreover, the record in this case indicates the party requesting the continuance and the reason behind the request. Where the trial record affirmatively demonstrates the necessity for a continuance and the reasonableness thereof, such a continuance will be upheld. *Aurora v. Patrick* (1980), 61 Ohio St.2d 107, 109, 15 O.O.3d 150, 399 N.E.2d 1220. Unlike the situations in *State v. Mincy*, 2 Ohio St.3d 6, 2 OBR 282, 441 N.E.2d 571, and *State v. Lee* (1976), 48 Ohio St.2d 208, 2 O.O.3d 392, 357 N.E.2d 1095, also cited by Myers, none of the questioned continuances was ordered by the trial court *sua sponte*. Even though a few journal entries were not specific, Myers's statutory right to a speedy trial was not infringed.

{¶63} In Proposition of Law 10, Myers contends that substantive motions he filed did not toll the statutory speedy trial time limit when the running of time had already been tolled pursuant to a previously granted motion for a continuance. As discussed above, Myers was brought to trial within the 270-day statutory time limit. Proposition of Law 10 is rejected.

{¶64} In Proposition of Law 11, Myers asserts that his constitutional rights to a speedy trial under both the United States Constitution and the Ohio Constitution were violated by periods of unnecessary delay by the state. In *Barker v. Wingo* (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101, the United States Supreme Court set forth a balancing test to determine whether trial delays are reasonable under the Sixth and Fourteenth Amendments to the United States Constitution. The following factors are to be considered: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id.

**{¶65}** In reviewing the first *Barker* factor, we find that the length of delay between Myers's first arrest on August 4, 1988, and his trial on January 2, 1996, encompassed approximately seven years and five months. However, the two-year period between the nolle prosequi and Myers's reindictment should not weigh against the state. Contrary to Myers's arguments, the state investigated other suspects in this crime at defense counsel's urging. Nothing suggests that the state sought the nolle prosequi in bad faith in order to give the prosecution more time to bolster its case against Myers. See *United States v. MacDonald* (1982), 456 U.S. 1, 7, 102 S.Ct. 1497, 71 L.Ed.2d 696. Almost all of the other delays, totaling nearly four years, were attributable to continuances requested by Myers, except the approximately four-month period during which the state requested continuances to complete forensic testing on the foreign pubic hair, including DNA analysis.

**{¶66}** Subtracting the two-year delay attributable to the nolle prosequi and the four years attributable to Myers's requested continuances, the trial was delayed for approximately one year and five months. A delay of less than one and one-half years in bringing the defendant to trial in a complex capital murder case is barely sufficient to be "presumptively prejudicial," which ordinarily triggers a constitutional speedy-trial analysis and inquiry into the remaining *Barker* factors. *Doggett v. United States* (1992), 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520, citing *Barker*, 407 U.S. at 530-531, 92 S.Ct. 2182, 33 L.Ed.2d 101. Under the circumstances of this case, the length of delay should not weigh against the state for constitutional speedy-trial analysis.

**{¶67}** Under the second *Barker* factor, the reason for delay, the request by the state to complete forensic testing on the pubic hair does not appear to have been made in bad faith or to overcome an "unfavorable report" as Myers asserts. The forensic testing by Michelle Yezzo that prompted further testing of the pubic hair by the state is more properly considered inconclusive than unfavorable. Moreover,

as discussed, the overwhelming majority of delays in bringing Myers to trial were occasioned by defense requests. This factor should not weigh against the state.

{¶68} The third *Barker* factor weighs in favor of Myers, given the number of motions wherein he asserted, however erroneously, that his statutory speedy-trial rights had been violated.

{¶69} Last, Myers's claim that he was prejudiced by the delays under the fourth factor of *Barker* is not persuasive. Myers claims that the delays in his trial caused Kim Grimes to be unavailable as a witness, and thus prevented him from eliciting testimony implicating someone other than himself as the killer. However, as discussed under Proposition of Law 2, the defense could have offered at trial Kim Grimes's allegedly damaging testimony from a pretrial hearing under Evid.R. 804(B)(1). It did not. Also, Grimes's ex-husband Gregory admitted during his testimony that he "might have" told his ex-wife that he killed Amanda Maher. Moreover, the defense called several other witnesses whose testimony tended to implicate Gregory Grimes or Terrance Rogers as the murderer(s). Thus, the fourth *Barker* factor does not indicate prejudice to Myers in his defense.

{¶70} In balancing the four *Barker* factors in this case, we hold that Myers was not denied his constitutional right to a speedy trial. Accordingly, we overrule Proposition of Law 11.

{¶71} In his final speedy-trial proposition, Myers claims in Proposition of Law 12 that the probation detainer was never properly served on him. Therefore, he asserts that the triple-count provisions of R.C. 2945.71(E) must apply for days he spent in jail awaiting trial. Myers waived any argument concerning the validity of the probation detainer by failing to raise the issue before the trial court. See, e.g., *State v. Kinley* (1995), 72 Ohio St.3d 491, 496, 651 N.E.2d 419.

{¶72} Based on the foregoing, Myers was not denied either his statutory or constitutional rights to a speedy trial.

*Suppression Issues*

**{¶73}** In Proposition of Law 14, Myers asserts that he was prejudiced by the trial court's failure to suppress the following statement that he made to Deputy Tom Adkins: "Tom, man, cocaine will make you do anything. It will make you do anything to get it." Myers asserts that the statement should have been excluded under Evid.R. 403(A), because its probative value was substantially outweighed by unfair prejudice.

**{¶74}** Before admitting this testimony, the trial court held a suppression hearing away from the jury. The court found that the statement was ambiguous and not necessarily an admission of cocaine use by Myers, and therefore not an inadmissible "other act" under Evid.R. 404(B). The trial court concluded that the statement had considerable probative value because a permissive inference arose therefrom that cocaine may have been Myers's motive for robbing the victim. The court rules that this probative value outweighed the danger of unfair prejudice to Myers.

**{¶75}** A trial court has broad discretion in the admission of evidence, and this court will not disturb such rulings absent an abuse of discretion. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 473 N.E.2d 768. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

**{¶76}** Here, the trial court did not abuse its discretion. Myers's statement is relevant, as it supports a reasonable inference that he murdered Maher while robbing her for money to buy cocaine. Any prejudice resulting to Myers cannot be considered "unfair," as it was freely made, was not the result of police questioning, and was not coerced.

**{¶77}** In Proposition of Law 21, Myers contends that the trial court erred in overruling his motion to suppress evidence seized from his automobile pursuant to warrant, because the affidavit requesting the warrant omitted facts or made a false

statement that would have caused the magistrate to refuse to issue the warrant. See *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667. Here, the trial court overruled Myers's motion to suppress wallets belonging to Maher and Smith that police discovered under the front passenger seat of his automobile.

{¶78} An affidavit supporting a warrant enjoys a presumption of validity. *State v. Roberts* (1980), 62 Ohio St.2d 170, 16 O.O.3d 201, 405 N.E.2d 247. In order to overcome the presumption, the defendant has "the task of supporting his allegations by more than conclusional accusations, or the mere desire to cross-examine." Id. at 177, 16 O.O.3d 201, 405 N.E.2d 247.

{¶79} Myers claims that police falsely described in the affidavit a vehicle alleged to have been seen at the murder scene as a "light-colored vehicle." At the suppression hearing, Detective Keith Linkhart testified that Gregory Grimes variously described a car he saw near the murder scene as "like a Road Runner * * *, yellow with black stripes," and as "light color, possibly yellow." Don Hilderbrand told Det. Linkhart that Myers drove a "pale cream colored car." When Det. Linkhart drove Grimes around the area of the murder scene, Grimes described a "light pale yellow or cream vehicle." Detective David Greene, the affiant on the request for the search warrant, testified that Det. Linkhart had told him that Grimes described the vehicle near the murder scene as a "light colored vehicle."

{¶80} Given such testimony, Myers fails to demonstrate that a false statement was made in the affidavit under *Franks,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667. Accordingly, the trial court did not err in overruling Myers's motion to suppress.

*Biased Grand Juror*

{¶81} In Proposition of Law 20, Myers contends that his second grand jury indictment was tainted with bias in violation of Section 10, Article I of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution. Myers claims that his right to an impartial, unbiased grand jury was violated, since

one of the grand jurors revealed that he or she had worked at Five Points Tavern and was familiar with Myers's carrying a knife into the bar. The grand juror recalled that this had happened seven or eight years previously, and described it as "really scary."

**{¶82}** Myers never raised this issue before the trial court, and thus has waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916. To constitute plain error it must appear that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

**{¶83}** Beyond his bare allegations of bias, Myers does not demonstrate how the grand juror was biased or incapable of carrying out the duties of a grand juror in a fair and impartial manner. Nor does Myers demonstrate that the brief statements of the grand juror influenced the grand jury's decision to indict Myers. Absent such a showing of bias or influence, we do not find the indictment to be defective. See *State v. Thomas* (1992), 80 Ohio App.3d 452, 456, 609 N.E.2d 601.

**{¶84}** In addition, the grand jury also heard testimony from Debbie Reagin that Myers had used a knife to coerce her to perform oral sex and sexual intercourse with him in February 1986. Thus, the fact that Myers had carried a knife was not something revealed solely by one grand juror. Moreover, the grand juror in issue was one of nine members of that panel, and only seven votes are needed to indict. Crim.R. 6(F). Accordingly, it cannot be said that but for the one grand juror Myers would not have been indicted. Proposition of Law 20 is overruled.

*Voir Dire Issues*

**{¶85}** In Proposition of Law 29, Myers argues that his death sentence should be vacated based on flaws in the voir dire. First, Myers asserts that the trial court erroneously excused two prospective jurors for cause based on their anti-death penalty views. Myers contends that the court erroneously applied the standard in *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, instead

of the more strict standard in R.C. 2945.25(C).  However, this court has consistently upheld use of the *Wainwright* standard in the death qualification of jurors.  See, e.g., *State v. Wilson* (1996), 74 Ohio St.3d 381, 388, 659 N.E.2d 292.  A review of the voir dire of both excused jurors, Archer and Knepper, indicates that their death penalty views "would prevent or substantially impair the performance of" their duties as jurors.  *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.

{¶86} Second, Myers claims that the trial court erred in not excusing prospective jurors Hill and Lupfer for cause, since they were "automatic" death penalty jurors under *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492.  Myers contends that the failure of the trial court to excuse these jurors for cause forced him to use up two peremptory challenges.

{¶87} However, the voir dire does not indicate that these jurors would have automatically voted for the death penalty.  Prospective juror Hill acknowledged that his questionnaire answers were strongly pro-death penalty, but stated that he had changed his perspective: "I would have to really consider hard before I sentenced a man to death even though I don't have a problem with that."  Likewise, prospective juror Lupfer retreated from any hint of being an "automatic" death penalty juror: "I will be as fair and as honest as I possibly could be. * * * *Disregarding my feelings of capital punishment.* * * * I honestly think I could be a fair person."  (Emphasis added.)

{¶88} Moreover, the court did allow the defense to ask such questions of these jurors on voir dire.  In so doing, the trial court avoided committing reversible error under *Morgan*.  *State v. Williams* (1997), 79 Ohio St.3d 1, 6, 679 N.E.2d 646.

{¶89} Last, Myers's complaint that the court erred in not allowing the defense to qualify jurors on their ability to consider specific mitigating factors is not well taken.  "*Morgan* does not require judges to allow individual voir dire on

22

separate mitigating factors." *State v. Wilson*, 74 Ohio St.3d at 386, 659 N.E.2d 292. Proposition of Law 29 is rejected.

*Evidentiary Issues*

Exclusion of Relevant Evidence

{¶90} In Proposition of Law 1, Myers argues that the trial court abused its discretion in not allowing him to call the prosecuting attorney and his former defense counsel to testify concerning why the original indictment was nolled in 1991.

{¶91} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Even relevant evidence may be excluded under Evid.R. 403(A) if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." See, also, *State v. Combs* (1991), 62 Ohio St.3d 278, 284, 581 N.E.2d 1071.

{¶92} Myers sought testimony from Greene County Prosecuting Attorney William Schenck during the guilt phase to discover the reasons why he dismissed the murder case in 1991. Essentially, Myers wanted Schenck to testify as to the relative strength of his case against Myers as of 1991. Yet the trial court relied on *State v. Today's Bookstore, Inc.* (1993), 86 Ohio App.3d 810, 817, 621 N.E.2d 1283, in disallowing such testimony as "neither probative nor material."

{¶93} In all likelihood, the prosecutor would not have dismissed the case in 1991 if he had believed that he could obtain a conviction against Myers. Defense counsel were free to address that issue during opening and closing arguments. In our view, the exclusion of this testimony did not amount to an abuse of discretion.

{¶94} During the mitigation phase, Myers sought to have his former counsel, Paul Dennis Pusateri, testify as to why the case was nolled in 1991, ostensibly to show that there was doubt as to Myers's guilt. The trial court limited

Pusateri's testimony to the contents of 1988 crime reports filed by Xenia police relating to the general area of the murder scene.

{¶95} The trial court declined Myers's request to instruct the jury on residual doubt, but stated that defense counsel was free to argue it. Defense counsel argued that Myers was not the killer and attempted to implicate Gregory Grimes or Terrance Rogers as the murderer. Under these circumstances, the trial court did not abuse its discretion in limiting Pusateri's testimony during the mitigation phase. The decision to limit this testimony was not unreasonable, arbitrary or unconscionable.

### "Lover Boy" Photo

{¶96} In Proposition of Law 4, Myers asserts error in the trial court's admission of photographs which show him at the time of his arrest wearing a shirt that bore the inscription "Lover Boy." Defense counsel objected to the photos at the guilt phase, but the photographs were admitted into evidence during both phases of trial. Myers contends that the photographs allowed the jury to infer that he was a sexual predator or sexual deviant. Myers further claims that a cumulative prejudicial effect was created by the photographs, since there was evidence that Myers had been convicted of sexual battery several years before, and had fathered a child when he was 14 years old.

{¶97} Here, the police officers who arrested Glenn Smith outside the Round Table bar identified Myers from these photo exhibits as the person who told them that he would take Maher home. The photographs were relevant to corroborate identity and thus assisted the trier of fact. The trial court did not abuse its discretion in admitting these photographs.

### Myers's Civil Deposition

{¶98} In Proposition of Law 18, Myers argues that the trial court erred in permitting the reading of his civil deposition to the jury because it contained three irrelevant and prejudicial matters: (1) the psychiatric evaluation of Myers, (2) the

nightmares Myers had after August 4, 1988, and (3) the illegitimate child Myers fathered when he was 14 years old.

{¶99} After the original murder charges were nolled in February 1991, Myers filed a federal civil rights action against the Greene County Prosecuting Attorney in January 1992. The attorney representing the prosecutor deposed Myers as part of that lawsuit. During Myers's capital murder trial, the state offered the deposition into evidence to the extent that it dealt with the facts of the murder case. The parties agreed as to which portions of the deposition would be read and agreed that any portion dealing with Myers's drug use would be redacted.

{¶100} Notably, Myers did not object to any of the matters he now terms irrelevant and prejudicial. Therefore, he has waived all but plain error. *Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916. The three matters complained about did not affect the outcome of Myers's trial. For instance, the fact that Myers suffered nightmares after August 4, 1988, could as easily be attributed to his being unjustly accused, as it could be attributed to a guilty conscience. Any error in this vein was not plain error. *State v. Webb* (1994), 70 Ohio St.3d 325, 335, 638 N.E.2d 1023.

*"Other Acts" Testimony*

{¶101} In Proposition of Law 3, Myers argues that the trial court erred in allowing "other acts" evidence that unfairly prejudiced him. In particular, Myers complains about testimony from Deborah Reagin that Myers had met her at a Xenia bar, then drove her to a cemetery and raped her.

{¶102} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The exception allowing the evidence "must be construed against admissibility, and the standard for determining admissibility of

such evidence is strict." *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

{¶103} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *Sage,* 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Thus, we review the trial court's decision by an abuse-of-discretion standard. See *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233; *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126.

{¶104} We conclude that the trial court did not abuse its discretion in admitting Reagin's testimony. That evidence related to Myers's identity in that it established a modus operandi on the part of Myers. *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus; *State v. Hutton* (1990), 53 Ohio St.3d 36, 40, 559 N.E.2d 432. A modus operandi is admissible because "it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator." *State v. Lowe* (1994), 69 Ohio St.3d 527, 531, 634 N.E.2d 616.

{¶105} The acts leading up to Reagin's rape and Maher's murder were very similar. Both times, Myers went to a Xenia bar where he saw a young woman and her male companion get into an argument. In both instances, after the male companion left the woman at the bar alone, Myers assured the woman that everything would be fine and offered to give her a ride home. In each instance, Myers left the bar alone with the young woman, took her to a secluded area where he used a weapon, and sexually assaulted the victim. The difference in the sexual assaults was that Maher apparently resisted, which resulted in her murder.

{¶106} Accordingly, we overrule Proposition of Law 3.

*Victim-Impact Evidence*

{¶107} In Proposition of Law 13, Myers claims that the state presented improper victim-impact evidence during trial. Specifically, Myers complains that

26

the prosecutor referred to the victim during opening statement as "the mother of an infant daughter." Myers further claims error in the introduction and use of a photo of Maher holding her daughter, several photos of the daughter, Sarah, and photos of Maher's ankle where a tattoo with Sarah's name is depicted. Myers objected to the picture of Maher with her daughter but did not accept the state's offer to crop the photo so that only Maher's face showed. Thus, Myers has no right to complain.

{¶108} Myers further objected to the admission of any photos of the victim's family in a pretrial motion. The trial court denied that portion of the motion. The photos of Maher holding her daughter were the only photos the state could find that portrayed Maher before she was murdered. The photos aided other witnesses in identifying her. The photos of the tattoo were necessary to help identify Maher as the victim, since her face was disfigured. The three photos of Sarah Maher were in the billfolds belonging to Maher and Smith found under the front seat of Myers's car. "Evidence relating to the facts attendant to the offense * * * is clearly admissible during the guilt phase." *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878.

{¶109} All of the evidence cited by Myers as victim-impact evidence was admissible. Moreover, none of the evidence here involved the usual type of victim-impact evidence where a member of the victim's family testifies at the close of the sentencing phase. None of this evidence was outcome-determinative. We reject Proposition of Law 13.

*Sufficiency of the Evidence*

{¶110} In Proposition of Law 15, Myers submits that his convictions must be reversed because they were supported by insufficient evidence.

{¶111} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d

492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶112} Here, the evidence is sufficient to establish Myers's guilt of the crimes of which he was convicted. The last time Maher was seen alive by several witnesses, she was with Myers. When Myers left the Round Table with Maher, they were seen walking together in the area where she was later found dying. Approximately an hour and a half before Maher was found lying next to the railroad tracks, Det. Rinehart saw her with Myers approximately 300 yards from that spot.

{¶113} Myers was seen alone getting into his car across from the Five Points Tavern at 2:10 a.m. He drove back to the Round Table, ordered a drink and immediately went into the restroom. After coming out of the restroom, Myers acknowledged that he tried to have sex with Maher, but that "she wasn't willing" and he "just dropped her off."

{¶114} When Smith was arrested outside the Round Table, Det. Savage took Smith's wallet out of his back pocket and gave it to Maher. Myers told Savage he would "take care of" Maher and make sure she got home. Later on the day of the murder, police found Smith and Maher's wallets stuffed in a glove under the front passenger seat of Myers's car.

{¶115} Forensic testing showed that a foreign pubic hair found on Maher's body was microscopically identical to known samples from Myers. The DNA genotype of the pubic hair was found to be the same as that of Myers, and that genotype is found in only two percent of the Caucasian population in North America. The same testing eliminated Glenn Smith as the donor of the hair, as well as Gregory Grimes and Terrance Rogers, who Myers contends were the actual killers.

{¶116} While in jail following his arrest, Myers was overheard by inmate Mark Timmons stating that he was with Maher near the railroad tracks and that he left her there. On the day of his arrest in 1988 while being booked, Myers exclaimed to a sheriff's deputy: "Tom, man, cocaine will make you do anything. It will make you do anything just to get it." During the weeks following his arrest in 1988, Myers asked fellow inmate David Tincher if he had ever "put three rocks in a girl." Myers stated that he had. Tincher asked Myers "why a railroad spike"? Myers responded that "it was handy." Myers then told Tincher not to attempt to drive anything through somebody's forehead because it won't go, but that "it went through the temple."

{¶117} Maher's autopsy revealed three rocks placed in her vaginal canal, a forehead wound consistent with someone trying to penetrate a railroad spike through it, and a spike through her right temple. In addition, Dr. Krause, the county coroner, opined that the fingernail marks found on Maher's neck were consistent with marks made by someone who had sustained an injury to his right ring finger. Myers injured his right ring finger in a motorcycle accident exactly one month before Maher's murder.

{¶118} Based on the foregoing, there was sufficient evidence to support Myers's convictions. We reject Proposition of Law 15.

*Jury Instructions*

{¶119} In Proposition of Law 16, Myers claims error in the court's refusal to instruct on residual doubt. Myers concedes that this court's decision in *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus, eliminated residual doubt as a mitigating factor. He asserts, however, that *McGuire* should not be applied retroactively, in spite of this court's holding that it may be so applied. See *State v. Bey* (1999), 85 Ohio St.3d 487, 509, 709 N.E.2d 484. Moreover, Myers's assertion that substantial evidence showed that Grimes and Rogers killed Amanda Maher is not borne out in the record.

{¶120} In Proposition of Law 17, Myers contends that the court's instructions on reasonable doubt during both phases of trial, based on the statutory definition of R.C. 2901.05, constitute reversible error. However, use of the statutory definition of reasonable doubt in jury instructions has been uniformly upheld. See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; *State v. Moore* (1998), 81 Ohio St.3d 22, 37, 689 N.E.2d 1.

{¶121} In Proposition of Law 23, Myers asserts that the instruction on purpose and intent improperly shifted the burden of proof to the accused. Myers further contends that including the term "foreseeable" in the instruction essentially undercut the requirement that the jury find specific intent to cause the death.

{¶122} Myers's claims of error are not well taken. A very similar instruction on causation was upheld in *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 230-231, 744 N.E.2d 163. Moreover, the court properly instructed the jury on purpose and intent before the instruction on causation.

{¶123} The overall charge clearly indicated that the burden was on the state to prove specific intent to kill, and that the jury was required to find specific intent to kill before it could convict Myers of aggravated murder. Also, the court's instruction on purpose and causation was similar to the instructions upheld in *State v. Burchfield* (1993), 66 Ohio St.3d 261, 611 N.E.2d 819, and *State v. Frazier* (1995), 73 Ohio St.3d 323, 331, 652 N.E.2d 1000. Including the term "foreseeable" in the instruction did not constitute reversible error because other instructions given by the trial court limited any prejudicial effect. *State v. Getsy* (1998), 84 Ohio St.3d 180, 196, 702 N.E.2d 866.

*Gruesome Photographs*

{¶124} Myers argues in Proposition of Law 25 that he was prejudiced by the admission of 45 cumulative and gruesome photographs of the victim's body.

{¶125} Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion. *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710; *Maurer*, 15 Ohio St.3d at 264, 15 OBR 379, 473 N.E.2d 768. Nonrepetitive photographs in a capital case, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. Id. at paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267.

{¶126} Myers did not object to the admission of any photograph during the guilt phase and, therefore, has waived all but plain error. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶127} Nine of the photographs admitted were of Maher's naked body, three depicted wounds to her forehead, fifteen showed her facial wounds, five portrayed injuries to her neck, seven were of the removal of the stones from her vaginal canal through her abdomen, and six showed injuries on her arms and legs.

{¶128} All of the photos illustrated the coroner's testimony describing Maher's injuries and helped to prove the killer's intent and the lack of accident or mistake. These photos also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042. Nine of the photographs appear to be duplicative of other autopsy photographs. However, these repetitive photographs did not affect the outcome of Myers's trial. Nor did the trial court commit error by admitting the other 36 photographs since the probative value of each one outweighed any prejudicial impact. Likewise, no abuse of discretion is apparent in the admission of a limited number of the original 45 photographs during the mitigation phase, even though Myers did object to their admission. Proposition of Law 25 is rejected.

*Victim-Impact Statement*

{¶129} In Proposition of Law 19, Myers contends that the trial court committed per se constitutional error during the sentencing hearing in considering

the victim-impact statement from Maher's family that included a statement that Myers "should pay for that [the murder] with his own life."

**{¶130}** After the jury had recommended death and been discharged, the trial court convened the sentencing hearing on March 1, 1996. The court stated that it had received and reviewed a victim-impact statement from Maher's family. The court then stated that "the statement has not provided any information that would in any way affect the Court's decision in this case. However, the Court is aware and very aware of the information contained in the victim impact statement."

**{¶131}** Absent an indication that the trial court considered the victim-impact evidence in arriving at its sentencing decision, the admission of such evidence is not reversible error. *Fautenberry*, 72 Ohio St.3d at 438, 650 N.E.2d 878. Moreover, this court will presume that a trial court considered only the relevant, material, and competent evidence in arriving at its judgment, unless the contrary affirmatively appears from the record. *State v. Dennis* (1997), 79 Ohio St.3d 421, 433, 683 N.E.2d 1096; *State v. Clemons* (1998), 82 Ohio St.3d 438, 448, 696 N.E.2d 1009.

**{¶132}** In our view, the trial judge clearly stated that the victim-impact statement provided nothing "that would in any way affect the Court's decision in this case." Moreover, the fact that the court further observed that it was "very aware" of the contents of the victim-impact statement does not suggest that the court considered the family's sentencing recommendation in arriving at its sentencing decision. Therefore, we overrule Proposition of Law 19.

*Right of Allocution*

**{¶133}** In Proposition of Law 24, Myers submits that he was prejudiced by the trial court's denial of his right of allocation provided under Crim.R. 32(A)(1). Myers asserts that he was improperly denied the opportunity to rebut the relevance of the information in the victim-impact statement.

**{¶134}** Crim.R. 32(A) provides that before imposing sentence in a criminal trial, the trial court shall "address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." This court has noted that the penalty phase in a capital case is not a substitute for defendant's right of allocution. *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684, 687 N.E.2d 1358. However, in *Reynolds*, we found no prejudicial error in the trial court's failure to ask the defendant whether he wished to make a statement, because that defendant had already made an unsworn statement, and presented a personal letter to the court during the mitigation phase, and had defense counsel make a statement on his behalf. Id.

**{¶135}** Recently, we held the provisions of Crim.R. 32(A) to be mandatory in both capital and noncapital cases, absent invited error or harmless error. *State v. Campbell* (2000), 90 Ohio St.3d 320, 738 N.E.2d 1178, paragraph two of the syllabus. The trial court's failure to personally address Myers prior to sentencing and allow him to make a statement constituted error under *Reynolds* and *Campbell*.

**{¶136}** However, similar to *Reynolds*, the defendant here exercised the right to speak on his own behalf during the mitigation phase and subjected himself to cross-examination. This testimony encompassed over 200 pages of the mitigation phase transcript. Among other things, Myers testified that the jury was wrong because he did not commit the murder, and that anyone who implicated him in the murder was lying.

**{¶137}** Thus, since Myers did in fact personally appeal for his life before the trial judge through his sworn testimony, the court's failure to specifically advise him of his right of allocution prior to sentencing was harmless error under *Reynolds* and *Campbell*. Accordingly, Proposition of Law 24 is overruled.

*Readmission of Trial Exhibits*

**{¶138}** Myers claims in Proposition of Law 32 that the trial court erred in readmitting trial exhibits during the mitigation phase. Myers's failure to raise this

issue before the court of appeals waives it before this court. *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph two of the syllabus. In any event, the trial court may properly allow repetition of much or all that occurred in the guilt phase pursuant to R.C. 2929.03(D)(1). *State v. DePew* (1988), 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542; *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75.

{¶139} Here, the prosecution offered a "pared-down list" of trial exhibits to be readmitted during the mitigation phase. A reduced number of photographs were offered for readmission and the trial court allowed both sides to argue for or against readmission before it admitted the photographs during the mitigation phase. Given the court's careful consideration of which trial exhibits were to be readmitted, Myers's claims of prejudice are not persuasive.

*Prosecutorial Misconduct*

{¶140} In Proposition of Law 5, Myers alleges that the prosecution engaged in misconduct during closing argument of both phases of trial and thereby deprived him of a fair trial. However, whether improper remarks constitute prosecutorial misconduct requires analysis as to (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶141} Myers first complains that the state improperly argued to the jury that he was guilty due to his alleged bad acts and character traits. Myers cites comments by the prosecutor that his prior sexual battery plea was relevant to this case, that he told Tincher that he had inserted three rocks into a woman's vagina, and that he told Deputy Adkins that "cocaine will make you do anything to get it." However, Myers's failure to object to these comments waived all but plain error.

Moreover, the comments cited by Myers constituted fair comment on evidence properly admitted at trial.

**{¶142}** Myers next submits that the prosecutor argued that he was guilty due to his association with criminals. Here, the prosecutor reminded the jury about the testimony of jailhouse informant David Tincher. The comment that "[i]t's the kind of man that David Myers would talk to" hardly appears to be a plea to the jury to find Myers guilty because of an association with a criminal. Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068.

**{¶143}** Myers also cites a comment by the prosecutor on the fact that Myers drove a railroad spike into Maher's head: "This establishes pure unadulterated intent to kill. That's not even an issue in this case." Again, Myers did not object. We find that the trial court's instructions to the jury that it was required to find specific intent to kill ameliorated any potential error.

**{¶144}** Next, Myers cites five instances where he claims that the prosecutor misrepresented critical facts during closing argument or misstated the testimony of witnesses. Myers failed to object to any of these alleged misstatements. Moreover, all of the complained-of comments were fair inferences that could be drawn by the jury, based on the testimony of the state's witnesses.

**{¶145}** Myers also contends that the prosecutor improperly appealed to the jurors' emotions: "Amanda had no justice in those last moments of her life. Now, in death, she asks for justice in her absence. * * * Surely on August 4th, 1988, Amanda Maher's time to die had not arrived." While these comments were theatrical, the prosecution is entitled to a certain degree of latitude in summation. *State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 433 N.E.2d 561.

**{¶146}** Myers claims that the prosecutor improperly denigrated defense counsel by commenting that the evidence presented by defense counsel "in some cases * * * was almost a snow job." This isolated, unobjected-to comment, however, was only marginally denigrating, and was not close in scope or scale to the comments we found improper in *State v. Keenan* (1993), 66 Ohio St.3d 402, 405-406, 613 N.E.2d 203.

**{¶147}** Next, Myers contends that the prosecutor improperly argued nonstatutory aggravating factors during penalty-phase closing argument. Myers points out that the prosecutor argued that the jury had to "determine what mitigation in this case is present that you find to stack up against the aggravating circumstance, namely the nature and circumstances *of this particular crime*, *the robbery, * * * aggravated robbery specification*." (Emphasis added.) We have held that prosecutors cannot argue that the nature and circumstances of an *offense* are aggravating circumstances. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus. On the other hand, the jury is required to consider the nature and circumstances of the *aggravating circumstances*. See, e.g., *State v. Stojetz* (1999), 84 Ohio St.3d 452, 464, 705 N.E.2d 329; R.C. 2929.03(D)(1). The comments here are ambiguous and may have been improper under *Wogenstahl.* However, any such error was, in our view, isolated, harmless, and not outcome-determinative. *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

**{¶148}** Other comments cited by Myers as arguing nonstatutory aggravating factors do not appear improper: "[Y]ou can't tolerate crimes of this nature * * * when the facts show the reckless indifference for human life the Defendant has shown" and his actions "reflected his utter disregard for her life." The comments that "you must be satisfied beyond a reasonable doubt, as you understand that phrase to be defined, that the aggravating circumstance, the robbery, the nature of what went into the robbery, is more important than the

mitigating factors" and "[n]o mitigating evidence presented can possibly overcome the brutality of [Myers's] actions" were not improper. Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation is worthy of little or no weight. *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292. Nor did the prosecutor improperly argue that Myers's prior sexual battery of Reagin was an aggravating factor.

{¶149} Myers next asserts that the prosecutor stated his personal opinions during closing argument: "[Myers's testimony] doesn't add up. * * * It's not credible. He is dishonest, manipulative, controlling"; "any punk with a weapon * * * can take a person's life like that." The expression of personal beliefs by a prosecutor is improper. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293. Yet, it is difficult for prosecutors to argue vigorously for the death penalty without making what might arguably be statements of personal opinion. This court may excuse what can be characterized as opinions of the prosecutor if the opinions are based on the evidence. See, e.g., *State v. Durr* (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674. We believe that none of the cited comments here constitutes plain error.

{¶150} Nor did the prosecutor improperly argue to the jury concerning victim impact. Even if statements that "it was frightful for [Maher] in her last moments" were improper, our independent review will cure the effect of such errors. *Landrum*, 53 Ohio St.3d at 124, 559 N.E.2d 710. We reject Proposition of Law 5.

*Effective Assistance*

{¶151} In Proposition of Law 22, Myers argues that both trial counsel and appellate counsel rendered ineffective assistance. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v.*

*Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. The same standard is used to determine whether appellate counsel performed ineffectively. *Watson*, 61 Ohio St.3d at 16, 572 N.E.2d 97. However, Myers does not demonstrate prejudice, i.e., "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley,* supra, at paragraph three of the syllabus.

{¶152} Myers first claims ineffective assistance in counsel's failure to cross-examine Debbie Reagin, who accused Myers of raping her in 1986. However, counsel's decision not to cross-examine may well have been part of their trial strategy. Counsel likely determined that cross-examining Reagin would risk bolstering or emphasizing her testimony rather than impeaching it. We will ordinarily refrain from second-guessing strategic decisions counsel make at trial, even where counsel's trial strategy was questionable. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189.

{¶153} Myers next claims that counsel were ineffective in stipulating to the admission of his civil deposition. Yet, this also appears to be a matter of trial strategy. By admitting the deposition, the defense underscored its position that Myers was not the killer and that Myers sought to redress the accusation of guilt through a civil action. As we noted under Proposition of Law 28, the fact that Myers had nightmares after the murder could be attributed to the defense position that Myers was unjustly indicted for a murder he did not commit. Moreover, defense counsel was able to get the court to redact portions of the deposition concerning Myers's drug use. While counsel should have objected to the portions of the deposition concerning Myers's teenage paternity and psychiatric condition, that failure to object did not unfairly prejudice Myers.

{¶154} Myers also complains of counsel's failure to object to improper remarks during closing arguments at both phases of trial. However, a reasonable

attorney may decide not to interrupt his opponent's closing argument. *State v. Keene* (1998), 81 Ohio St.3d 646, 668, 693 N.E.2d 246. Objections can " 'disrupt the flow of a trial' " and " 'are considered technical and bothersome by the factfinder.' " *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339, quoting Jacobs, Ohio Evidence (1989) iii-iv. A decision not to interrupt during closing arguments reflects an "objective standard of reasonable representation." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶155} Myers complains that counsel's guilt-phase closing argument overemphasized the issue of capital punishment. This emphasis, however, does not constitute deficient performance. A review of the instances cited by Myers reveals that counsel apparently tried to persuade the jurors of the gravity of their task and the consequences of a guilty verdict for his client. In our view, this was in the nature of trial strategy, not an undermining of Myers's right to a presumption of innocence.

{¶156} Myers also asserts that counsel failed to fully cross-examine Dr. Krause as to when he formed his opinion that fingernail impressions on Maher's neck were consistent with the assailant's having an injury to his ring finger and that, as a result, the jurors were left ignorant on this point, which affected their ability to assess Krause's conclusion. However, the jury was aware that Krause's opinion in this vein was formed after the coroner's verdict since defense counsel elicited this information from Krause during recross. No deficient performance is demonstrated.

{¶157} Myers next claims that counsel were deficient in failing to object to a biased grand jury. Yet, as discussed under Proposition of Law 20, Myers fails to adequately demonstrate bias or fear on the part of the one grand juror or that the grand juror had influenced the rest of the panel.

{¶158} Contrary to Myers's next assertion, counsel's failure to "life qualify" the jury during voir dire does not constitute deficient performance. As

discussed under Proposition of Law 29, examination of the voir dire transcript reveals that no "automatic" death-penalty juror was seated on the jury.

{¶159} Myers was not prejudiced by counsel's failure to object to gruesome photographs. As we noted under Proposition of Law 25, all of the photographs admitted illustrated the coroner's testimony and helped prove intent and a lack of accident or mistake. Although some photographs were repetitive, their admission and counsel's failure to object to them did not affect the outcome of Myers's trial.

{¶160} Counsel's failure to object to the victim-impact statement at sentencing did not prejudice Myers. The trial judge declared that the statement "has not provided any information that would in any way affect the Court's decision in this case."

{¶161} Myers next contends that counsel were deficient in withdrawing their objection to photographs depicting Myers wearing the shirt with the inscription "Lover Boy." However, the photographs were admissible because they portrayed Myers exactly as he appeared to witnesses in the hours leading up to the murder. Similarly, Myers also failed to raise before the court of appeals counsel's failure to (1) challenge the probation detainer, (2) offer the testimony of Kim Grimes, or (3) retain Robert Young as a blood-spatter expert. Even if these issues had been raised in the court of appeals, we find that Myers has not demonstrated prejudice.

{¶162} As we intimated under Proposition of Law 24, counsel's failure to secure Myers's right of allocution was harmless error, since he had already testified at length during the mitigation phase. See *Campbell*, 90 Ohio St.3d at 325, 738 N.E.2d 1178.

{¶163} Likewise, counsel's failure to object to the reasonable doubt instruction made no difference, since we have repeatedly upheld similar instructions in capital cases. (See discussion under Proposition of Law 27.) Myers

was not prejudiced by counsel's failure to object to the readmission of trial exhibits during the mitigation phase. (See discussion under Proposition of Law 32.)

{¶164} Myers's assertion of ineffective assistance based on defense counsel's failure to appeal the state's entry of the nolle prosequi is patently absurd. The *nolle prosequi* dismissed the murder charges against Myers and reopened the investigation of the Maher murder. Counsel should not be second-guessed for failing to foresee a future indictment of Myers and the speedy-trial implications of the failure to appeal.

{¶165} Finally, Myers has not demonstrated prejudice in appellate counsel's failure to raise assignments of error that (1) the trial court erred in not accepting the *nolle prosequi* in "open court," (2) the trial court abused Myers's right of confrontation in refusing to order the state to provide proper addresses of witnesses, and (3) the trial court's failure to inform the jury that a solitary juror could prevent imposition of a death sentence. Given the record of this case, none of these allegations would have compelled a reversal of Myers's convictions or death sentence by the court of appeals. Thus, we also reject Myers's claims of ineffective assistance of appellate counsel.

{¶166} Based on all the foregoing, we overrule Proposition of Law 32.

*Constitutionality*

{¶167} In Propositions of Law 26, 27, 28, 30, and 31, Myers challenges Ohio's death penalty statutes on numerous constitutional grounds. We summarily reject these challenges. See, e.g., *Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. McNeill* (1998), 83 Ohio St.3d 438, 453, 700 N.E.2d 596; *Maurer,* 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768; *State v. Gumm* (1995*),* 73 Ohio St.3d 413, 653 N.E.2d 253; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

INDEPENDENT REVIEW AND PROPORTIONALITY

{¶168} At the mitigation hearing, Myers testified at length and subjected himself to cross-examination. He maintained his innocence in the murder of Amanda Maher and asserted that those witnesses who had testified against him had been lying. However, Myers did declare that he has "grown a great deal in the Lord since the summer of '88," and considered himself "very immature" in the past by indulging in alcohol and drugs. He claimed that he had stopped using cocaine on July 18, 1988, and tried to get into a rehabilitation program because a close friend had overdosed and nearly died a few days earlier. Myers stated that he was not a good husband but considers himself to be a good ex-husband. He also claimed innocence in the sexual battery of Reagin and asserted that she was drunk and coming on to him. He further claimed that the prosecutor was out to get him. On cross-examination, Myers stated that before July 1988, he had a $500-a-day cocaine habit that was financed largely by transporting the drug for dealers.

{¶169} Also testifying on Myers's behalf were several relatives, including his mother, Ruth Myers. Mrs. Myers recounted that Myers is one of five children and that her husband, a welder, died in 1989. Although Myers repeated eighth grade, he graduated from high school. Myers's first marriage produced two daughters, but ended in divorce in 1988. However, his ex-wife brings the children to visit Myers and the family, and keeps in contact with them. Ruth Myers also noted that Myers fathered a child as a teenager, and paid child support for the child.

{¶170} Myers's current spouse, Sandra Myers, also testified. She has known Myers since grammar school, but moved to South Carolina with her family when she was 12 years old. She moved back to Ohio in 1993 to be with Myers, and then married Myers "[b]ecause I love him." They regularly attended church together when they could.

{¶171} Myers's sister, Freda Chambliss, offered brief testimony, but only to attempt to establish that an investigator's description of the suspect's car did not fit her brother's car.

{¶172} The co-pastor of Myers's church, Cheryl Gilliland, testified that Myers and his wife Sandy had faithfully attended her church, the Faith Christian Fellowship. She visited Myers several times after his arrest in 1988, and performed the wedding ceremony for Myers and Sandy. Gilliland stated that Myers helped clean the church when it moved to Beavercreek, and was a greeter every fourth Sunday. She noted that Myers contributed a tithe to the church. She also testified that she trusted her children with Myers and considers him a friend.

{¶173} Myers's ex-wife, Angela Thompson, testified that Myers always sent her money for child support when he was working. Myers loves his daughters and has an excellent relationship with them.

{¶174} The defense presentation during mitigation was essentially a plea to the jury that it had made a mistake when it found that Myers murdered Amanda Maher.

{¶175} After independent assessment, we conclude that the evidence proves beyond a reasonable doubt the aggravating circumstance in this case: that Myers murdered Maher during an aggravated robbery (R.C. 2929.04[A][7]).

{¶176} The nature and circumstances of the offense offer nothing in mitigation. Myers assured Glenn Smith and Xenia police officers that he would make sure Maher got home after Smith was arrested outside the Round Table bar. A few hours later, police found Maher next to the railroad tracks, naked and barely clinging to life. A railroad spike had been driven into Maher's right temple and three stones had been shoved into her vagina. Based on the evidence, it appears that Myers robbed and murdered Maher after she resisted his sexual advances.

{¶177} Myers's history, character, and background provide modest features in mitigation. Myers has fathered three children and has an excellent relationship

with his two daughters. He paid child support whenever he was working. Myers claims to have overcome his substance abuse problem and to have sought out rehabilitation towards that end. He also became involved with his church in various activities.

{¶178} With regard to the mitigating factors of R.C. 2929.04(B), only the (B)(7) catchall factor is relevant in this case. The love, support, and devotion Myers shares with his family deserve some weight in mitigation. See *State v. Eley* (1996), 77 Ohio St.3d 174, 189, 672 N.E.2d 640. Perhaps some mitigating weight should be accorded to Myers's recognition of his problems as a husband and as a substance abuser.

{¶179} Upon independent weighing, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Myers led Maher to believe that he would help her get home after her boyfriend was arrested, but, instead, he took her to a secluded area, strangled her to unconsciousness, put three stones in her vagina, and drove a railroad spike into her head. He then absconded with Maher's and Smith's wallets. Myers's actions merit the capital penalty to which he was sentenced.

{¶180} The death penalty in this case is both appropriate and proportionate when compared with capital cases combining murder with aggravated robbery. See, e.g., *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253; and *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685.

{¶181} For these reasons, the judgment of the court of appeals is hereby affirmed.

Judgment affirmed.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

————————————

William F. Schenck, Greene County Prosecuting Attorney, and Robert K. Hendrix, Assistant Prosecuting Attorney, for appellee.

Dennis J. Adkins and Suzanne M. Lough Wynn, for appellant.

_____