[Cite as *State v. Banks* , 2011-Ohio-3801.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J.<br>Hon. John W. Wise, J. |
| -vs- | |
| | Case No. 10-CA-36 |
| SHERIKA BANKS | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Fairfield County Common
                                                          Pleas Court, Case No. 09-CR-365

JUDGMENT:                                    Affirmed

DATE OF JUDGMENT ENTRY:        July 25, 2011

APPEARANCES:

For Plaintiff-Appellee                        For Defendant-Appellant

GREGG MARX                                 THOMAS R. ELWING
Assistant Prosecuting Attorney          60 West Columbus Street
Fairfield County, Ohio                       Pickerington, Ohio 43147
239 W. Main Street, Ste. 101
Lancaster, Ohio 43130

*Hoffman, J.*

{¶1}   Defendant-appellant Sherika Banks appeals her conviction entered by the Fairfield County Court of Common Pleas.  Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE CASE AND FACTS

{¶2}   On October 30, 2009, Appellant was indicted by the Fairfield County Grand Jury on four counts:  trafficking in 1 to 25 grams of crack cocaine, as both a principal and for complicity, a second degree felony; possession of 10 to 25 grams of crack cocaine, a second degree felony, as both a principal and for complicity; trafficking in an unspecified amount of crack cocaine, a fifth degree felony; and permitting drug abuse, a fifth degree felony, for knowingly permitting a 2008 Chrysler motor vehicle to be used for the commission of a drug offense.

{¶3}   The matter proceeded to a jury trial on February 2, 2010.  At trial, the State introduced evidence the Fairfield-Hocking Major Crimes Unit (MCU) employed a confidential informant, Danny Wilson, to purchase crack cocaine from suspected drug traffickers.  Wilson had worked as a paid informant for approximately three years, and had a prior criminal history of trafficking in drugs.

{¶4}   On May 22, 2010, Wilson participated in a "buy/bust" in which he was paid to arrange a purchase of crack cocaine.  Wilson made a phone call to Ronnell Leeper arranging to purchase $150 worth of crack cocaine.  Wilson made arrangements to meet Leeper at a BP gas station in Lancaster, Ohio.  Leeper, told Wilson he would find him at the BP and pick him up.  Prior to the meeting, Wilson was outfitted with a wireless transmitter.

{¶5} Officers of MCU maintained visual contact with Wilson during the pick-up, and observed him enter the rear passenger side of a silver Chrysler sedan. This same Chrysler vehicle was later located outside a private residence in Lancaster.

{¶6} The officers remained outside the residence while Wilson went inside. Eventually, the Chrysler left the residence and officers of MCU initiated a stop of the vehicle.

{¶7} Leeper was found in the front passenger seat of the vehicle. Appellant was found in the driver's seat. Wilson was in the back seat of the car. The officers found rocks, believed to be crack cocaine, in Wilson's hand. A plastic bag containing similar rocks believed to be crack cocaine was found in the car. Officers also found other contraband on Leeper's person, including crack cocaine, pills and money.

{¶8} The items seized as a result of the arrest were received by Jennifer Meadows, the property room manager for the Lancaster Police Department, on May 28, 2009. Meadows testified at trial she was unable to account for the whereabouts of the drugs from May 22, 2009 to May 28, 2009, although she believed they were in the custody of MCU and among the confiscated property.

{¶9} Pursuant to a negotiated plea agreement, Leeper testified against Appellant, stating he paid her to drive him from Columbus to Lancaster. He testified she concealed cocaine in her crotch while they were driving in case they got pulled over. The confidential informant, Danny Wilson, also testified to witnessing Appellant pull drugs out of her pants.

{¶10} The jury returned guilty verdicts on all four counts of the indictment. The State agreed to merge the two second degree felony offenses for trafficking and

possession of the same 10 to 25 grams of crack cocaine for sentencing.  The State elected to sentence on the trafficking charge.  The trial court imposed a mandatory two year sentence on the second degree trafficking offense and six months for each of the two fifth degree felonies to be served concurrent to each other, but consecutive to the mandatory two year term on the second degree trafficking.  A five year term of community control was also imposed.

{¶11}  Appellant now appeals, assigning as error:

{¶12}  "I. APPELLANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶13}  "II. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S CRIM.R. 29(A) MOTION FOR ACQUITTAL BECAUSE THE RULING WAS NOT SUPPORTED BY EITHER SUFFICIENT EVIDENCE OR THE MANIFEST WEIGHT OF THE EVIDENCE DUE TO THE STATE'S FAILURE TO ESTABLISH A PROPER CHAIN OF CUSTODY."

I.

{¶14}  In the first assignment of error, Appellant argues her trial counsel was ineffective for failing to impeach the credibility of Danny Wilson, the confidential informant.  Appellant further asserts counsel was ineffective in failing to object to the introduction of other acts evidence.

{¶15}  A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry in whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's

essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell* (1993), 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

**{¶16}** In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Bradley,* 42 Ohio St.3d at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. *Id.*

**{¶17}** In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing counsel's errors were so serious as to deprive the defendant of a fair trial; a trial whose result is reliable. *Strickland* 466 U.S. at 687, 694, 104 S.Ct. at 2064; 2068. The burden is upon the defendant to demonstrate there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.; Bradley,* supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* supra; *Bradley,* supra.

**{¶18}** The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, 538 N.E.2d 373, quoting *Strickland* at 697. Accordingly, we will direct our attention to the second prong of the *Strickland* test.

**{¶19}** Appellant maintains after Wilson completed his trial testimony, the trial court learned Wilson spoke to Appellant outside the courtroom in violation of the court's order prohibiting a witness from speaking about the case while the case was pending. During the exchange, Appellant claims Wilson admitted to perjuring himself on the stand.

**{¶20}** Upon learning of the incident, the trial court excused the jury, and heard testimony on the issue. Cornelia Banks testified:

**{¶21}** "Q. And Ms. Banks, what is your relationship to Sherika Banks?

**{¶22}** "A. Sherika is my daughter.

**{¶23}** "Q. All right. Today, were you standing outside - - when we took our break, you were in the courtroom prior to the break?

**{¶24}** "A. Right.

**{¶25}** "Q. Where did you go after you left the courtroom?

**{¶26}** "A. Right outside the door where the ashtrays are.

**{¶27}** "Q. Okay. Were you smoking?

**{¶28}** "A. Yes.

**{¶29}** "Q. Okay. And did at any point you interact with anybody who testified in this courtroom?

**{¶30}** "A. The guy that had just came down, Dan.

**{¶31}** "Q. All right. Lieutenant Dan or Danny Wilson?

**{¶32}** "A. Right, Danny Wilson.

**{¶33}** "Q. Okay. And how did you interact with him?

**{¶34}** "A. He came out the door. He stopped where we were standing and said, 'Good luck. I hope you win.'

**{¶35}** "And Sherika said, 'Well, you lied on me.'

**{¶36}** "And he said, 'I know. Everything I just told was a lie.'

**{¶37}** "Q. Anything else said?

**{¶38}** "A. He said, 'I'm going to hire your attorney to defend me.'

**{¶39}** "Q. Okay. Anything else that you recall?

**{¶40}** "A. No. He ran down the street.

**{¶41}** "Q. Okay. And which way did he go down the street?

**{¶42}** "A. That way. That was on Main going back.

**{¶43}** "Mr. Leach: Thank you."

**{¶44}** Tr. 586-587.

**{¶45}** The following exchange then occurred between trial counsel and the court,

**{¶46}** "The Court: Well, the Court order to Mr. Wilson was to not discuss his testimony, nor the questions which were asked of him here today.

**{¶47}** "So if the Court believes that all that he said was, 'Good luck. I hope you win,' I think that does not really constitute discussing his testimony or the questions which were asked of him here today.

**{¶48}** "I don't know that the Court is really here to decide at this present moment whether - - a finding of contempt, as much as it is to decide whether or not, as I understood it, Mr. Leach, you were going to perhaps inquire of this - - attempt to inquire of these witnesses in front of the jury or to try to put Mr. Wilson back up on the witness stand.

**{¶49}** "Is there a request for that?

**{¶50}** "Mr. Leach: I think that when we were in chambers, that was discussed and the Court - - I think we came to a conclusion it was going to be out of the presence of the jury for the Court's inquiry.

**{¶51}** "The Court: Correct, correct.  Initially, yes.

**{¶52}** "Mr. Leach: Now that we've had that, I think - -I do not believe I will call him to the stand for any additional questioning in this matter.  In a strategy that Defense counsel will make, I think that will be in my client's best interest at this time.

**{¶53}** "The Court: All right.

**{¶54}** "Well, then, as far as that is concerned, there's nothing for the Court to decide.  You're not calling back Mr. Wilson to the witness stand.

**{¶55}** "As far as the contempt is concerned, I'm going to take any finding under consideration.  We'll rule on that matter after the conclusion of this trial.  I don't see any reason that needs to be decided at this point."

**{¶56}** Tr. at 595-597.

**{¶57}** Based upon the foregoing, Appellant's trial counsel elected as a part of trial strategy not to call Wilson back to the stand.  A decision regarding which defense to pursue at trial is a matter of trial strategy "within the exclusive province of defense counsel to make after consultation with his client." *State v. Murphy,* 91 Ohio St.3d 516, 524, 2001–Ohio–0112. This court can only find counsel's performance regarding matters of trial strategy deficient if counsel's strategy was so "outside the realm of legitimate trial strategy so as 'to make ordinary counsel scoff." ' *State v. Woullard,* 158 Ohio App.3d 31, 813 N .E.2d 964, 2004–Ohio–3395, ¶ 39, quoting *State v. Yarber*

(1995), 102 Ohio App.3d 185, 188, 656 N.E.2d 1322. Further, the Ohio Supreme Court has recognized if counsel, for strategic reasons, decides not to pursue every possible trial strategy, defendant is not denied effective assistance of counsel. *State v. Brown* (1988), 38 Ohio St.3d 305, 319, 528 N.E.2d 523.

{¶58} Decisions regarding what witnesses to call at trial fall within trial strategy and, absent prejudice, generally will not constitute ineffective assistance of counsel. *State v. Hessler,* Franklin App. No. 01AP–1011, 2002–Ohio–3321; *State v. Coulter* (1992), 75 Ohio App.3d 219, 598 N.E.2d 1324. We find decision not to call Wilson back to the stand was a tactical decision, and the Ohio Supreme Court has stated "[w]e will ordinarily refrain from second-guessing strategic decisions counsel make at trial, even where counsel's trial strategy was questionable. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189." *State v. Myers* (2002), 97 Ohio St.3d 335, 362, 780 N.E.2d 186, 217.

{¶59} Appellant further asserts counsel was ineffective in failing to challenge the competency of the confidential informant, Wilson. During his trial testimony, Wilson testified:

{¶60} "Q. (By Mr. Leach) Before we listen to the rest of it, when did you tell anybody - - Major Crimes Unit people, anybody - - that you saw Sherika pull those drugs out of her crotch?

{¶61} "A. I don't know if I ever did.

{¶62} "Q. So in a debriefing, that wouldn't - - you wouldn't have told them at the debriefing? You testified that it should be detailed.

**{¶63}** "A. Yeah, it should have, but I would like to say, put this on record, that I was on disability for amnesiactic (sic) disorder, a disability, so that I can't always remember 100 percent everything.  And that was a diagnosis, mental diagnosis from a psychiatrist.

**{¶64}** "Q. So you are being treated for asthmatic - -

**{¶65}** "A. No.

**{¶66}** "Q. What was it again?

**{¶67}** "A. Amnesiactic disorder.  It's from years of alcohol and drug abuse, fighting, wrecks, everything.  Like it's caused brain damage in my memory, part of my brain.

**{¶68}** "Q. So are you telling us that you can't remember some parts of what happened that day, potentially, because of this problem?

**{¶69}** "A. Sometimes - - yeah, I got to be reminded sometimes, refreshed. Some things are clearer to me than others, is what I'm saying.  I can't always get everything.  I try to be as detailed as I can, but then like I'll have to - - like when they're listening to the recording, when I'm wearing the wire and they're listening to the recording, let's say, then I'll forget something and they'll remind me.  And then we'll play it on the recording so it's refreshed to me.

**{¶70}** "Q. So you have no independent recollection.  You're using them to refer - - -

**{¶71}** "A. Not on all of it.

**{¶72}** "Q. On some of it.

**{¶73}** "A. Some of it.

{¶74} "Q. Okay.  And so when I asked you if you - - I don't know, swallowed drugs, for example, you have no recollection if you did or didn't or you do?

{¶75} "A I'd know - - I'd know if I did.

{¶76} "Q. Oh.  And when I asked you why didn't you tell anybody about Sherika pulling drugs out of her crotch, you don't have a recollection of that or - -

{¶77} "A. No, I do, but I don't remember if I told them?

{¶78} "Q. How do we know what you told or didn't tell them?

{¶79} "A. Just because you just have to hear.

{¶80} "Q. And so is everything - - you believe everything you told them - - everything you told them is on that recording that I'm going to play?

{¶81} "A. I'd hope.

{¶82} "Q. But based on your disability, your amnesia - - I'll just call it amnesia - -

{¶83} "A. Amnesiactic disorder.

{¶84} "Q. I know.  Amnesiactic disorder, because of that, you - - do you still have that disorder today?

{¶85} "A. Yes, yes.

{¶86} "Q. Is it treated with drugs?

{¶87} "A. No.

{¶88} "Q. So - - -

{¶89} "A. It's brain damage, something you don't treat.

{¶90} "Q. No recovery for it or anything like that?

{¶91} "A. No.

{¶92} "Q. So is it possible that there's things on this recording that - -

**{¶93}** "A. Just like I ain't going to remember until - - I ain't going to remember what happened a month ago unless you play that.  You can play it in five minutes, and five minutes ago, I'll forget it until I hear it again to refresh.  Do you know what I'm saying?  But then things start clicking and then I can remember things real good.

**{¶94}** "Q. But sometimes they don't click.

**{¶95}** "A. Sometimes they don't click.

**{¶96}** "Q. And you may never remember.

**{¶97}** "A. That's true.

**{¶98}** "Q. So all those things that you told us today, are you basing that information based on something you've read that refreshed your memory?

**{¶99}** "A. No, no.  That - - about everything I said, I remember."

**{¶100}** Tr. at 549-553.

**{¶101}** Appellant asserts trial counsel should have moved the trial court to exclude Wilson's testimony pursuant to Evidence Rule 601(A), which reads:

**{¶102}** "Every person is competent to be a witness except:

**{¶103}** "(A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

**{¶104}** Those persons classified as mentally impaired are presumed incompetent as witnesses and must have their competency to testify determined by the court.  *State v. Miller* (1988), 44 Ohio App.3d 42; *State v. Kinney* (1987), 35 Ohio App.3d 84.

{¶105} Appellant maintains when trial counsel learned of the Wilson's admitted memory disorder, counsel should have moved the trial court to exclude Wilson's testimony and requested a competency evaluation outside the presence of the jury.

{¶106} The lack of perfect recollection does not render someone incompetent to testify. We find counsel's questioning of Wilson effectively challenged the accuracy of Wilson's testimony. We find the above cited record does not support the conclusion Wilson was incompetent to testify; therefore, counsel was not ineffective for not challenging the same.

{¶107} Finally, Appellant asserts trial counsel was ineffective in failing to object to "other acts" evidence introduced by the State. Appellant cites to Leeper's testimony during which he testified to prior crimes of complicity to drug trafficking committed by Appellant, and counsel failed to object. Specifically, Leeper testified:

{¶108} "Q. Now, was the day you got arrested, was that the first time Sherika drove you down here?

{¶109} "A. No.

{¶110} "Q. Had she done that before?

{¶111} "A. Yes.

{¶112} "Q. Do you know how many times she'd done it?

{¶113} "A. About three or four other times.

{¶114} "Q. Did you pay her to drive you down?

{¶115} "A. Yes.

{¶116} "Q. How much?

{¶117} "A. 100 to 150 dollars every time.

**{¶118}** "Q. And how do you know Sherika?

**{¶119}** "A. I'm the godfather of her niece.

**{¶120}** "Q. How long have you known her?

**{¶121}** "A. About seven years.

**{¶122}** "Q. Did you have to tell her what you were - - why she was driving you?

**{¶123}** "A. No.  She knew what I was doing.

**{¶124}** "Q. How would she know that?

**{¶125}** "Mr. Despetorich: Objection, Your Honor.

**{¶126}** "Mr. Landefeld: Can we approach?

**{¶127}** "The Court: Rephrase.

**{¶128}** "If you need to approach, go ahead.

**{¶129}** (Thereupon, a side-bar discussion was held between the Court and counsel as follows:)

**{¶130}** "Mr. Despetorich: He's asking how the Defendant would know that.

**{¶131}** "Mr. Landefeld: If he can say.

**{¶132}** "Mr. Despetorich: It's speculation.

**{¶133}** "Mr. Landefeld: Not really.  If he ever handed her crack cocaine to put in her crotch - - I can rephrase it, if you'd like.  But he didn't have to tell her.

**{¶134}** "'Why didn't you have to tell her'

**{¶135}** "'Because she knew.'

**{¶136}** "'Well, how did she know?'

**{¶137}** "I don't know that that's objectionable.

**{¶138}** "The Court: You can rephrase and lay more of a foundation.

{¶139} "Mr. Landefeld: I'll do my best.

{¶140} (Thereupon, the discussion was concluded and the proceedings continued as follows:)

{¶141} "Q. (By Mr. Landeld) Let me ask it this way: You said you didn't have to tell Sherika what you did for a living or why she was driving.

{¶142} "A. Well, I did.  She knew what - - she knew what I did.  She knew what I do, so when I asked her, she said yes.

{¶143} "Q. Okay.  Has she ever witnessed you sell crack cocaine to individuals?

{¶144} "A. A couple of times, yes.

{¶145} "Q. And on the day you were arrested - - you said before you came down to Lancaster, that you serviced a couple of other people.

{¶146} "A. Yes.

{¶147} "Q. Was she with you then?

{¶148} "A. Yes.

{¶149} "Q. And I believe you also testified earlier that she had the crack cocaine in her crotch.

{¶150} "A. Yes.

{¶151} "Q. Did you give that to her?

{¶152} "A. Yes.

{¶153} "Q. When did you give that to her?

{¶154} "A. On the way down.

{¶155} "Q. All right.  Were you in the car when you did that?

{¶156} "A. Yes."

{¶157}  Tr. at 663-666.

{¶158}  Ohio Evidence Rule 404 reads,

{¶159}  "(B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶160}  We find the testimony was properly admitted to demonstrate absence of mistake, Appellant's knowledge and/or intent while providing transportation to Leeper. We find counsel was not ineffective for failing to object to the same. Furthermore, Appellant would not be prejudiced by the testimony she had merely witnessed him sell crack cocaine to others in the past.

{¶161}  The first assignment of error is overruled.

II.

{¶162}  In the second assignment of error, Appellant argues the trial court erred in overruling her Criminal Rule 29 motion for acquittal.

{¶163}  In determining whether a trial court erred in overruling an appellant's motion for judgment of acquittal, the reviewing court focuses on the sufficiency of the evidence. See, e.g., *State v. Carter* (1995), 72 Ohio St.3d 545, 553, 651 N.E.2d 965, 974; *State v. Jenks* (1991), 61 Ohio St.3d 259 at 273, 574 N.E.2d 492 at 503.

{¶164}  When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. See *State v.*

*Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546 (stating, "sufficiency is the test of adequacy"); *State v. Jenks* (1991), 61 Ohio St.3d 259 at 273, 574 N.E.2d 492 at 503. The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; Jenks, 61 Ohio St.3d at 273, 574 N.E.2d at 503.

**{¶165}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Wilson,* 713 Ohio St.3d 382, 387–88, 2007–Ohio–2202 at ¶ 25–26, 865 N.E.2d 1264, 1269–1270. An appellate court may not merely substitute its view for that of the jury, but must find "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* supra, 78 Ohio St.3d at 387, 678 N.E.2d 541. (Quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins,* supra.

**{¶166}** Appellant maintains the State failed to establish a proper chain of custody for alleged contraband; therefore, the trial court erred in failing to grant the Rule 29 motion for acquittal and her conviction was against the manifest weight of the evidence.

**{¶167}** The State bears the burden of establishing a proper chain of custody, although the duty is not absolute. *State v. Blevins* (1987), 36 Ohio App.3d 147. The State merely needs to establish it is reasonably certain substitution, alteration or

tampering did not occur.  Id.  Breaks in the chain of custody go to the weight of the evidence, not admissibility.  Id.

{¶168}  At trial in this matter, Detective Thurston testified at trial to tagging the evidence, and properly sealing the same.

{¶169}  Jennifer Meadows, the Property Room Manager for the Lancaster Police Department, testified,

{¶170}  "Q. Where else would a police officer bring the drugs before going to the Lancaster Police Department?

{¶171}  "A. Well, Detective Norris, working through Major Crimes Unit, they have their own separate facility and they also have a place that they could secure evidence there until it was brought to the Lancaster Police Department, to the evidence room.

{¶172}  "Q. Okay.  So this happened on May 22nd of 2009 that he came into contact with the drugs.  And your testimony today was, the first time you came into contact with the drugs was May 28th, 2009; correct?

{¶173}  "A. Yes.

{¶174}  "Q. So that's five, six days in between.

{¶175}  "A. Yes.

{¶176}  "Q. Do you know where the drugs were at prior to him getting them over to the Lancaster Police Department evidence room?

{¶177}  "A. They were in the MCU property.

{¶178}  "Q. And you don't work in the MCU property room.  Is that a separate property room?

{¶179}  "A. Correct.

**{¶180}** "Q. Okay. So the drugs could have been manipulated, touched, out of your chain of custody while - - in those six days?

**{¶181}** "A. I don't know.

**{¶182}** "Q. Okay. So you can't account personally for what happened from may 22nd to May 28th?

**{¶183}** "A. Correct.

**{¶184}** "Q. Okay. You can only testify today to what happened on May 28th.

**{¶185}** "A. Yes.

**{¶186}** "Q. And that's when Detective Norris handed you the drugs.

**{¶187}** "A. Yes."

**{¶188}** Tr. at 627-628

**{¶189}** Again, breaks in the chain of custody go to the weight of the evidence, not admissibility. It is for the trier of fact to weigh the evidence and to judge the credibility of the witnesses, and we cannot find the jury lost its way in its role. The record does not affirmatively demonstrate any substitution, altercation or tampering of the evidence.

**{¶190}** We find there was competent, credible evidence supporting Appellant's convictions. Leeper testified at trial Appellant drove the vehicle in question for Columbus to Lancaster for the sum of $150.00, and she carried approximately 20 grams of crack cocaine inside her underwear while driving to avoid law enforcement from finding the drugs in the event of a stop.

**{¶191}** The second assignment of error is overruled.

{¶192} Appellant's conviction in the Fairfield County Court of Common Pleas is affirmed.

By: Hoffman, J.

Gwin, P.J.  and

Wise, J. concur

                       s/ William B. Hoffman_____
                       HON. WILLIAM B. HOFFMAN

                       s/ W. Scott Gwin_____
                       HON. W. SCOTT GWIN

                       s/ John W. Wise_____
                       HON. JOHN W. WISE

IN THE COURT OF APPEALS FOR FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO                              :
                                           :
    Plaintiff-Appellee                 :
                                           :
-vs-                                       :              JUDGMENT ENTRY
                                           :
SHERIKA BANKS                              :
                                           :
    Defendant-Appellant                :              Case No. 10-CA-36


For the reasons stated in our accompanying Opinion, Appellant's conviction in the Fairfield County Court of Common Pleas is affirmed.  Costs to Appellant


s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ W. Scott Gwin _____
HON. W. SCOTT GWIN


s/ John W. Wise_____
HON. JOHN W. WISE