[Cite as *State v. Jordan*, 2018-Ohio-4108.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 106273

---

# STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

# HENRY A. JORDAN

### DEFENDANT-APPELLANT

---

## JUDGMENT:
## AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-607809-A

**BEFORE:**  Blackmon, J., Stewart, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:**  October 11, 2018

**ATTORNEY FOR APPELLANT**

John P. Parker
988 East 185th Street
Cleveland, Ohio 44119


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Debora Brewer
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1} Henry A. Jordan ("Jordan") appeals from his convictions for rape, aggravated burglary, and kidnapping and assigns the following errors for our review:

I. There was insufficient evidence that Henry Jordan was at the crime scene or involved in the incident December 23, 2012 and Due Process under the State and Federal Constitutions has been violated.

II. The convictions are against the manifest weight of the evidence.

III. Counsel was constitutionally ineffective under the Sixth and Fourteenth Amendments of the federal Constitution and Strickland v. Washington, 466 U.S. 668 (1984).

IV. Prosecutor misconduct deprived Jordan of a fair trial under the Sixth and Fourteenth Amendments of the federal Constitution.

V. A combination of ineffective assistance of counsel and prosecutorial misconduct deprived Jordan of a fair trial in violation of the Sixth and Fourteenth Amendments of the federal Constitution.

{¶2} Having reviewed the record and pertinent law, we affirm. The apposite facts follow.

{¶3} On December 23, 2012, a man forced his way into M.S.'s house and raped her. M.S. told the police that she did not know who this man was, and eventually the case went cold. In 2015, information became available in the Combined DNA Index System ("CODIS") that matched Jordan's DNA with a "dried stain" swab taken from M.S.'s neck at the time of the rape. On July 14, 2016, Jordan was charged with two

counts of rape, one count of kidnapping, and one count of aggravated burglary[1]. The case was tried to the court, where evidence was presented that M.S. knew Jordan and had previously had a consensual sexual relationship with him. On January 26, 2017, Jordan was found guilty of all four counts. On August 22, 2017, the court sentenced him to seven years in prison. It is from these convictions that Jordan appeals, arguing that M.S.'s fiancé, Marcus Ladson, was the man who raped her on the night of December 23, 2012.

## Judicial notice

{¶4} Jordan filed a motion asking this court to take judicial notice of four exhibits used at a 2016 trial in which Ladson was convicted of a gang-related murder and other violent felonies. *State v. Ladson*, Cuyahoga C.P. No. CR-16-604466 (June 7, 2016). This motion was referred to the merit panel. The exhibits are three pictures of Ladson showing his tattoos and one expert report from a Cleveland police Gang Impact Unit detective concluding that Ladson is a member of the criminal gang the Heartless Felons. Jordan argues that he was prejudiced when these exhibits were not used in his trial because: 1) M.S. described her attacker as having tattoos, and Jordan does not have any tattoos; and 2) M.S. did not identify Ladson as her attacker for fear that he would retaliate, as a gang member, if she told the police the truth.

---

[1]Jordan was indicted for three additional counts concerning an unrelated incident. These three counts were severed for trial and ultimately dismissed.

**{¶5}** Evid.R. 201 governs "judicial notice of adjudicative facts; i.e., the facts of the case. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(A) and (B). The exhibits submitted by Jordan fail to fit into either category.

**{¶6}** The Ohio Supreme Court has held that judicial notice may be taken of dockets or records in other cases. *Natl. Distillers & Chem. Corp. v. Limbach*, 71 Ohio St.3d 214, 216, 643 N.E.2d 101 (1994). However, the law does "not state that we may take judicial notice of evidence contained in the transcripts [and] adjudicative facts contained in earlier cases." *Id*. Furthermore,

> [i]n a direct appeal of a criminal case, appellate review is limited "to what transpired in the trial court as reflected by the record made of the proceedings." *State v. Ismail*, 54 Ohio St.2d 402, 405-406, 377 N.E.2d 500 (1978). A claim that requires consideration of materials outside of the record of proceedings in the trial court is not the type of claim that can be considered on direct appeal.

*State v. Presnell*, 8th Dist. Cuyahoga No. 96172, 2011-Ohio-2801, ¶ 11.

**{¶7}** Accordingly, we deny Jordan's motion for judicial notice.

**Trial Testimony**

**{¶8}** In the case at hand, the first witness to testify was M.S.'s daughter C.M., who was five years old at the time of the incident and nine years old at the time of trial. C.M. testified that on the night of December 23, 2012, her mom M.S. was getting her and her younger brother ready for bed when someone knocked on their door. M.S. went to see who was at the door, and C.M. heard her mother scream and yell for help. C.M. went into the living room and saw "stuff, broken stuff all over the floor." M.S. was naked and on the floor, and a man was there with "his pants down halfway. * * * He was on top of her and she was on the bottom." C.M. testified that she did not know who this man was and she had never seen him before. M.S. "had scratches all over her body," and she was crying.

**{¶9}** M.S. told C.M. to get her phone. C.M. called her aunt and said that "a bad guy was there." C.M.'s aunt, who lived down the street, came to M.S.'s house and called 911. The police arrived shortly after. C.M. could not make an in-court identification of the man she saw that day, testifying, "I don't remember how his face looked." Asked if she had ever seen Jordan before, C.M. stated, "No." Asked if her mom had a boyfriend, C.M. replied, "No." Asked if she knew "a guy named Marcus Ladson," C.M. answered, "I don't remember him."

**{¶10}** M.S. testified that in 2012, she was living with her two children and her fiancé Marcus Ladson. She had met Jordan that summer while walking down the street. M.S. and Jordan exchanged phone numbers and had a consensual sexual relationship.

On December 23, 2012, when M.S. was putting her kids to bed, she heard a knock on the door. She opened the door but did not see anyone there, although she saw a silver car parked outside. All of a sudden, Jordan "rushed in" to her house smelling of liquor. M.S. testified about what happened next:

> Once he — once he came in, he had, like, my neck, and, you know, forced me, like, on the floor where — I had my son's bed, like a — toddler bed. I was, like, on the floor, like, towards the TV and he had me, like, towards my stomach, like I was down on my stomach, and, you know, forced me — * * * he rushed into the door, like, having — you know, from behind my neck and, you know, I was on the floor and all I remember is I was on my stomach and his pants was down. * * * My stomach was, like — I was, like, facing down on my stomach and he was on top of me.

{¶11} M.S. testified that Jordan "shoved" her to the floor "and his pants was down and his penis was in my vagina." M.S. was crying and screaming. M.S. testified that she thought Jordan used a condom because she saw "a wrapper on the floor." Jordan then turned her around and put his penis in her mouth. "His stuff, you know, was in. I guess he was — had used a condom, but his stuff was in my mouth. * * * He just had my neck and grabbed his penis and put it in my mouth * * *. I was coughing. I was gagging. I was throwing up."

{¶12} M.S. testified that she could not physically get up and leave. M.S. tried to get Jordan to stop by throwing a lamp at him. M.S. does not remember Jordan leaving, but she recalls her daughter C.M. and her son standing in the doorway as she was crying and screaming.

All I know is my daughter was — my daughter and my son was, like, standing there. My daughter, she had got — somehow she got to my phone. She found my phone and she had called her auntie, whether — she didn't know — it was just whoever she called first and realized it was her auntie and her auntie came down because she lived down the street from me and her auntie came, which is Alexis, she had came. She called the police.

{¶13} M.S. testified that when the nurse at the hospital and the police interviewed her, she told them that she did not know who did this to her, although she "tried to say his name, * * * Harry or Henry" and allegedly described him as being bald. M.S. also testified that she told the police her attacker had tattoos. "I was scared and I thought that, you know, nobody would believe me, you know, and that actually that he actually had done it and had hurt me, you know, but I admit that I do know him." M.S. testified that she never saw or talked to Jordan again after the night of the assault. However, on cross examination M.S. testified inconsistently about whether her relationship with Jordan continued after December 23, 2012.

{¶14} M.S. testified that in 2015, a detective contacted her about a "DNA hit from a case from 2012." The police showed M.S. a photographic lineup, and she picked out Jordan as "the one that came into my house" and raped her on December 23, 2012.

{¶15} Former Cleveland police detective Andrew Harasimchuk testified that on December 27, 2012, he interviewed M.S. concerning her allegations of rape. M.S. indicated that she had a consensual sexual partner at the time, Marcus Ladson. Det. Harasimchuk had Ladson come to the station to give the police "an elimination standard swab" of his DNA. This sample was sent to the DNA lab so Ladson's DNA "can be

eliminated from the sexual assault kit." The results of M.S.'s rape kit showed one swab from M.S.'s neck that contained "unknown DNA."

{¶16} There was no testimony from Det. Harasimchuk about a condom, the name "Harry or Henry," or M.S.'s assailant being bald or having tattoos. By May 2013, the police were unable to develop a suspect from this information, and the case went cold.

{¶17} Cleveland police officer Timothy McGinty testified that he responded to a sexual assault call at M.S.'s house on December 23, 2012. Officer McGinty testified that the front door jamb was pushed out, indicating forced entry, and there was "some kind of lamp globe that's broken on the floor." Officer McGinty testified that M.S. was "very upset," and he requested EMS transport her to the hospital. Furthermore, Officer McGinty testified that he went back to M.S.'s house after accompanying her to the hospital to look for a fingernail that M.S. stated broke off during the attack.

> Q: Okay. And included in your work was a visit to Fairview Hospital and then a return visit to the house to look for a fingernail?
>
> A: Correct.
>
> Q: * * * Did you look for a condom wrapper while you were at the scene of the house?
>
> A: We looked for any kind of evidence.
>
> Q: Were you ever told about a condom wrapper?
>
> A: No.

**{¶18}** Meredith Molnar testified that, in 2012, she was working as a sexual assault nurse examiner ("SANE nurse") at Fairview Hospital. On December 23, 2012, she examined M.S. for a sexual assault. Molnar testified that she asked M.S. what happened and M.S. reported to her that the following occurred:

> Me and my fiancé and my kids were chilling in my house watching TV and my fiancé was getting ready to go to the bus for work and I was getting my kids ready for bed around 9 p.m. I went to the hallway to get clothes and into the kitchen to get food for dinner and into the bathroom to wash [C.M.] up. She was in the tub. I told her to give me a few minutes to get dinner ready and she said okay.
>
> Then I went into the hallway and I heard someone banging really loud on the front door. I waited in the hallway and someone was banging again on the front door, so I went to go see who it was through the curtain on the door and the man bum-rushed the door somehow. The door hit me on my head and I stumbled back and he got past me in the hallway in the house, and I heard my daughter yell out for me, and I think it scared him or something and he started choking me from behind with one of his arms and my mouth started foaming and I think I passed out.
> I woke up because my daughter was hitting my legs above my knees yelling at me to get up. I woke up and I didn't see him and my shorts were messed up and down to my thighs. My shirt was still on. I panicked and all I could do is cry.
>
> My daughter called her auntie, who lived down the street, and she came over and called 911.

**{¶19}** Molnar testified that M.S. assumed she was penetrated vaginally, because her pants were down, "but she was unsure if a penis or fingers were penetrating her vagina." Furthermore, M.S. indicated "that she thinks she remembers performing oral sex" on the offender. Based on these allegations, Molnar took swabs of M.S.'s vaginal and oral cavities, as well as other areas of her body, including a "dried stain" of M.S.'s

neck "because she stated [she] was being choked by the assailant with one arm." Molnar explained that for a dried stain, "we will dip sterile swabs in sterile water and swab that area for possible DNA."

{¶20} Molnar also took pictures of M.S.'s neck, on which was a "linear superficial laceration." M.S. had additional "fresh" bruising on her chin, upper back, left arm, wrist, and hand, and both knees. Molnar testified that M.S. was "very emotional, crying, shaking, talking very quickly." According to Molnar, M.S. indicated to her that Ladson left the house prior to the incident occurring. Nothing in Molnar's testimony or M.S.'s medical records indicated a description of M.S.'s attacker, including whether he was bald or had tattoos. There is also no mention of the name "Harry or Henry"; rather, M.S.'s medical records indicated that the attacker was a "stranger." Additionally, a checklist that is part of M.S.'s medical records asked if a condom was used at the time of the assault, and the box checked is "Unsure."

{¶21} Hristina Lekova is a DNA analyst at the Cuyahoga County Regional Forensic Science Laboratory, and she processed M.S.'s rape kit in January 2013. According to Lekova, "Marcus Ladson's DNA is present in the sperm fraction of the anal swab and the cutting from the crotch area of the underpants. It's also in the sperm fraction of the vaginal swab * * *. He's also part of the mixture in the dried stain on the neck * * * as well as the fingernail scrapings."

**{¶22}** No "seminal fluid" was found in M.S.'s oral swab. An enzyme consistent with vaginal fluid or saliva was found in M.S.'s oral swab, although Lekova did not reach a conclusion regarding the oral swab, other than the enzyme "did not come from the seminal material." The state asked Lekova, "if somebody was wearing a condom and put a condom in a victim mouth and had vaginal fluid on that condom, would that be consistent with your findings?" Lekova answered, "Yes, that's possible for that vaginal fluid to be transferred in the mouth cavity."

**{¶23}** Other than Ladson's and M.S.'s DNA, an unknown DNA profile was found on the "dried stain" swab taken from M.S.'s neck. This unknown DNA profile was uploaded to the CODIS database, and the case went cold.

**{¶24}** Lekova's involvement in this case resumed in December 2015, when she was given a reference swab of Jordan's DNA that was submitted in another case. Lekova testified that "Jordan could not be excluded as a possible contributor to the DNA mixture obtain from * * * the dried stain" found on M.S.'s neck. According to Lekova, the material of the dried stain, i.e., what kind of bodily fluid, was unknown. Asked if Jordan's DNA was found in M.S.'s vaginal swab, Lekova replied, "There is no Mr. Jordan in the vaginal swab." Lekova further explained that if an offender uses a condom, she would not expect to find his DNA in the victim's vaginal swab.

**{¶25}** Cleveland police detective Karl Lessman testified that he works in the CODIS Task Force of the Sex Crimes Unit. In October 2015, he received information

from the coroner's office identifying Jordan as "a hit" in M.S.'s cold case. Det. Lessman compiled a photo array and, along with former Det. Harasimchuk, went to M.S.'s house to see if she could identify her attacker. M.S. picked Jordan's photo out of the lineup. Det. Lessman located Jordan and took a bucal swab from him, which was sent to the DNA lab. Jordan's DNA was identified as a match with the DNA found on the dried stain on M.S.'s neck.

## Sufficiency of the Evidence

{¶26} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶27} The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*, 8th Dist.

Cuyahoga No. 97365, 2013-Ohio-1337, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶28} In the case at hand, Jordan was convicted of the following offenses: Two counts of rape in violation of R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force"; one count of aggravated burglary in violation of R.C. 2911.11(A)(1), which states in pertinent part that "[n]o person, by force * * * shall trespass in an occupied structure * * * when another person * * * is present, with purpose to commit * * * any criminal offense, if * * * [t]he offender inflicts * * * physical harm on another * * *"; and one count of kidnapping in violation of R.C. 2905.01(A)(4), which states in pertinent part that "[n]o person, by force * * * shall * * * restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will * * *."

{¶29} Jordan argues that, as a matter of law, evidence that he "could not be excluded" from the DNA found on the dried stain and M.S.'s inconsistent statements about knowing her attacker are insufficient evidence to convict him of rape and the other associated offenses.

{¶30} These arguments are best addressed under a manifest weight of the evidence theory. This court has held that "there is no requirement, statutory or otherwise, that a victim's testimony be corroborated as a condition precedent to a rape conviction."

*Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, at ¶ 39.   At trial, M.S. testified

that Jordan "rushed in" to her house uninvited, forcefully raped her vaginally and orally,

choked her, and restrained her to the point that she was not free to move.   This evidence is

sufficient to convict Jordan of the offenses with which he was charged.

{**¶31**} Accordingly, Jordan's first assigned error is overruled.

## Manifest Weight of the Evidence

{**¶32**} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶

25, the Ohio Supreme Court addressed the standard of review for a criminal manifest

weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in
>
> *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. In
>
> *Thompkins*, the court distinguished between sufficiency of the evidence and
>
> manifest weight of the evidence, finding that these concepts differ both
>
> qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held
>
> that sufficiency of the evidence is a test of adequacy as to whether the
>
> evidence is legally sufficient to support a verdict as a matter of law, but
>
> weight of the evidence addresses the evidence's effect of inducing belief. *Id.*
>
> at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose
>
> evidence is more persuasive — the state's or the defendant's? We went on to
>
> hold that although there may be sufficient evidence to support a judgment, it

could nevertheless be against the manifest weight of the evidence. *Id*. at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶33} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶34} Jordan argues that he was not the man who raped M.S.: "what is more likely is that Marcus Ladson attacked [M.S.] and she concocted a story to protect herself and her children from any retribution from Ladson." To support this argument, Jordan points to evidence that only Ladson's DNA — and not Jordan's DNA — was found in M.S.'s anal and vaginal swabs, as well as in the scrapings from underneath M.S.'s fingernails. Ladson's and Jordan's DNA were found in the dried stain, and neither Ladson's nor Jordan's DNA was found in M.S.'s oral swab. Jordan also argues that M.S.'s testimony was inconsistent and, thus, not credible.

**{¶35}** The state, on the other hand, argues that the weight of the evidence supports Jordan's convictions. M.S. testified that Jordan choked and raped her. M.S. further testified that "I guess he was — had used a condom," which allegedly explains why Jordan's DNA was not found in her vaginal area or mouth. However, Jordan's DNA was found on the dried stain from M.S.'s neck. C.M. testified that she saw, but did not know, the man who attacked her mother. Furthermore, M.S. testified as to why she did not identify Jordan at the time of the rape, stating that she was scared and thought nobody would believe her.

**{¶36}** Upon review of the record, we find that M.S.'s trial testimony included the following: Jordan was the man who raped her; she thought she saw a condom wrapper on the floor of her house, so assumed that Jordan used a condom; at the time of the incident, she told either the SANE nurse or the detective the name "Harry" or "Henry" and stated that her assailant was bald and had tattoos.

**{¶37}** We are aware that these details are uncorroborated. A review of the 2012 evidence shows no mention, from M.S. or anyone else, about a condom, the name of the attacker, or tattoos. The SANE nurse and two Cleveland police officers that were involved in the case in 2012 testified. M.S.'s medical records, including the SANE nurse's report, were introduced into evidence. There are no police reports — if any exist — that were made part of the record in this case.

{¶38} Both police officers stated that M.S. did not say anything about a condom in 2012. No mention of a condom was made in M.S.'s medical records. Additionally, there is nothing in the medical records, SANE nurse's testimony, or the police officer's testimony indicating that M.S. told anyone that her attacker was named "Harry" or "Henry," that he was bald, or that he had tattoos. All of these details came to light only after Jordan was implicated via CODIS as the unknown DNA contributor.

{¶39} Although we do find conflicting testimony, we cannot say that the evidence weighs heavily against conviction, nor can we say that the trial court lost its way and created a manifest miscarriage of justice. This court has held that "the weight to be given the evidence and the credibility of the witnesses are primarily matters for the trier of fact." *State v. Friedlander*, 8th Dist. Cuyahoga No. 90084, 2008-Ohio-2812, ¶ 16. "When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [factfinder] believed the prosecution testimony." *State v. Gilliam*, 9th Dist. Lorain No. 97CA006757, 1998 Ohio App. LEXIS 3668 (Aug. 12, 1998). Appellate courts are required to give deference to the factfinder's conclusions because "[t]he demeanor of witnesses, the manner of their responses, and many other factors observable by [the factfinder] simply are not available to an appellate court on review." *State v. Bierbaum*, 3d Dist. Seneca No. 13-88-18, 1990 Ohio App. LEXIS 1204 (March 14, 1990).

{¶40} Accordingly, Jordan's second assigned error is overruled.

## Ineffective Assistance of Counsel

**{¶41}** To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 3743 (1989).

**{¶42}** Jordan argues that his trial counsel was ineffective by failing to investigate and pursue the theory that Ladson was the man who raped M.S. Jordan alleges that counsel should have cross examined witnesses about Ladson and presented "evidence in the public record concerning" Ladson, including Ladson's 2015 and 2016 convictions for murder and other gang-related violent felonies, which resulted in a sentence of life in prison. *See State v. Ladson*, Cuyahoga C.P. No. CR-15-599880 (Nov. 3, 2015), and *State v. Ladson*, Cuyahoga C.P. No. CR-16-604466 (June 7, 2016).

**{¶43}** The state, on the other hand, argues that counsel was not ineffective, because courts "will ordinarily refrain from second-guessing strategic decisions counsel makes at trial * * *." *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 151. Furthermore, the state argues that Jordan was not prejudiced, because there is nothing

other than speculation that the outcome of the trial would have been different had counsel investigated Ladson further. Additionally, M.S. has consistently maintained that her sexual activity with Ladson was consensual.

**{¶44}** We find that Jordan has failed to show that his trial counsel's performance was deficient and he has failed to show that he was prejudiced. Accordingly, Jordan's counsel was not ineffective, and his third assigned error is overruled.

### Prosecutorial Misconduct

**{¶45}** "The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected the substantial rights of the accused. The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor." (Citations omitted.) *State v. Eisermann*, 8th Dist. Cuyahoga No. 100967, 2015-Ohio-591, ¶ 43. Prosecutorial misconduct constitutes reversible error only in rare cases. *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993).

**{¶46}** Jordan argues the state failed to turn over to the defense information regarding Ladson's gang and criminal activity in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* stands for the proposition that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. *See also* Crim.R. 16(B)(5).

According to Jordan, this evidence would have been used to impeach M.S. and explain why she did not identify Ladson as her attacker.

**{¶47}** The state, on the other hand, argues that evidence of Ladson's criminal history is not exculpatory and any effect it may have had on M.S.'s credibility is purely speculative. Nothing in the record indicates that Ladson was a suspect in this case, and there is nothing suspicious about finding M.S.'s fiancé's DNA in the swabs taken from M.S.'s rape kit. Furthermore, "*Brady* does not apply to materials that are not wholly within the control of the prosecution. There is no need to require the state to 'disclose' material that is readily available to the defense." *State v. McGuire*, 8th Dist. Cuyahoga No. 105732, 2018-Ohio-1390, ¶ 24.

**{¶48}** Accordingly, we find that Ladson's criminal record is not exculpatory evidence as envisioned by *Brady*. Jordan's fourth assigned error is overruled.

## Cumulative Error

**{¶49}** A judgment of conviction may be reversed if the cumulative effect of errors deemed separately harmless "deprives a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). By its terms, the cumulative error doctrine will not provide a basis for reversal in the absence of multiple errors. *State v. Madrigal*, 87 Ohio St.3d 378, 398, 872 N.E.2d 52 (2000). Upon review, we find that the doctrine of cumulative error is not applicable to the instant case as

we do not find multiple instances of harmless error. Jordan's fifth assigned error is overruled.

{¶50} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

PATRICIA ANN BLACKMON,   JUDGE

MELODY J. STEWART, P.J., and
ANITA LASTER MAYS , J., CONCUR